UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X   Case No. 21-759

People of the State of New York, by LETITIA JAMES,   **FIRST AMENDED**
Attorney General of the State of New York,   **COMPLAINT**

                                  Plaintiff,
          -against-

NIAGARA WHEATFIELD CENTRAL SCHOOL DISTRICT,

                                  Defendant.

-------------------------------------------------------------------------------X

## PRELIMINARY STATEMENT

1.      The People of the State of New York, by their Attorney General, Letitia James, bring this action against Defendant Niagara Wheatfield Central School District ("NWCSD" or "the District") to remedy Defendant's violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, ("Title IX") and its negligent supervision of students.

2.      Federal law guarantees all students the right to a public education, and it provides that they shall not be deprived of this most basic right on the basis of sex. To that end, Title IX specifically requires that schools take steps to protect students from gender-based harassment and sexual assault that create a hostile educational environment and deprive students of educational opportunities. New York state law further requires that schools provide adequate supervision of their students to protect them from harm.

3.      Despite these clear legal and moral mandates, the NWCSD repeatedly and egregiously failed the very students it was required by law to educate and to protect. It deliberately and callously ignored complaints by students of rape, assault, sexual harassment, and gender-based bullying, and it failed to take any meaningful action against perpetrators or to

1

protect victims from future harassment. The District's shocking indifference to its students' suffering—which has led to school-wide protests and nationwide outrage, but no systemic reforms—has caused victims mental, emotional, and physical injury, and it has deprived them equal access to education.

4. NWCSD's indifference to gender-based bullying, harassment, and assault not only affects the victims, but it also impacts the student body and the school community as a whole. The school district's inaction has shown students—particularly young women—that the very people charged with ensuring their safety in school will not protect them in their time of need.

5. Indeed, in the last several years, there have been over thirty documented incidents of sex discrimination, sexual harassment, sexual assault, or gender-based bullying at NWCSD. In response to these dozens of incidents, NWCSD has not created a single written safety plan or taken any documented effort to keep students safe following a rape, physical or sexual assault, or harassment.

6. Accordingly, the Office of the New York State Attorney General ("OAG") brings this action to remedy NWCSD's repeated and systematic violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and its negligent supervision of its students, and to ensure that all students are provided a safe learning environment and equal educational opportunities.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over Plaintiff's Title IX claim pursuant to 28 U.S.C. § 1331 because the matter in controversy arises under the law of the United States. This Court

has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367(a) because that claim arises out of the same case or controversy as Plaintiff's federal claim.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiff's claims took place within Niagara County in the Western District of New York.

## PARTIES

9. Plaintiff, the People of the State of New York, represented by and through their attorney general, Letitia James, is a sovereign state of the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to Executive Law § 63(1) and the *parens patriae* doctrine.

10. Where, as here, the interests in the health and well-being of the People of the State of New York as a whole are implicated, the OAG possesses *parens patriae* standing to commence legal action against Defendant to stop its unlawful practices.

11. The OAG has a quasi-sovereign interest in the health and well-being of the People of the State of New York, which includes preventing discrimination in educational programs.

12. As the representative of the People of New York, the OAG has a unique mandate to obtain wide-ranging relief that benefits the broader community and promotes the public good. The OAG seeks prospective relief to end Defendant's unlawful policies, practices, and/or customs and ensure that they do not continue in the future.

13. Defendant Niagara Wheatfield Central School District is a public school district in Niagara County, New York. NWCSD and its component schools are recipients of federal financial assistance. Niagara Wheatfield Senior High School (the "High School"), Edward

Town Middle School (the "Middle School"), and Errick Road Elementary School are part of NWCSD.

## FACTUAL ALLEGATIONS

### Discrimination and Gender-Based Harassment

14. On multiple occasions, students have reported sexual assault and harassment to the District, but the District took no action to protect them from their assailants and harassers.

15. As a result, the students experienced severe emotional distress, missed numerous hours of classroom instruction, and some left school entirely.

*The District Failed to Protect TG After She Was Raped*

16. TG was raped by a male student in the latter's home in May 2018.

17. After she reported the incident to the police, her assailant, ED, was arrested.

18. Prior to the start of the school year, TG obtained a restraining order preventing ED from coming near her outside of school.

19. TG and ED were both seniors at the High School in the 2018-2019 school year.

20. Before the school year started, TG's mother met with then-principal, Michael Mann, bringing with her the order of protection and texts from ED apologizing for what he did to TG.

21. Mr. Mann responded that the criminal charges were not yet proven, so ED would not be punished. He promised TG's mother that TG would not have contact with him but provided no concrete plan about how the school would keep her daughter away from her rapist.

22. That fall, ED went out of his way to encounter TG multiple times a week. Although their lockers were not near each other, ED would frequently stand outside her classroom and wait for her to walk out of the room and then glare at her.

23. TG notified the school counselor of these repeated, purposeful interactions the second week of school, but nothing was done. TG had a panic attack as a result.

24. Later, at the school's open house, Assistant Principal Jeff White came up to TG's family and said, in front of other students and families, that he believed TG had faked the panic attack for attention.

25. TG was a cheerleader, and ED was a star athlete. While ED was permitted to continue playing sports and starting in games, TG was not allowed to cheer at certain games after she missed practice in order to speak to the assistant district attorney who was prosecuting the case against ED. In refusing to excuse TG's absence related to her rape case, the head coach of the cheerleading team observed that "girls get assaulted all the time."

26. In December 2018, TG received a snapchat from a classmate with a picture of her rapist, with the caption "your boyfriend." TG provided the message to Principal Michael Mann about it, but he took no action.

27. Additional classmates began texting TG, harassing her and insinuating that she enjoyed having sex with ED. TG showed those texts to the assistant principal, but again, he took no action.

28. Classmates began taunting TG and telling her to "watch her back." TG's mother contacted the superintendent about the harassment, but she received no response.

29. As a result of the continued harassment and bullying, TG's mental health suffered, and she started missing school.

30. Meanwhile, none of the students who harassed TG were disciplined, and ED continued to have class right across from TG—the school did not alter his schedule.

31. In January 2019, TG began a theater class. On multiple occasions, ED stood in the doorway of that class and stared at TG, which led her to begin skipping that class.

32. On May 23, 2019, ED pleaded guilty to third-degree rape.

33. That day, TG's mother contacted the school, informing them of the guilty plea and explaining that there would be a sentencing in July.

34. Despite being notified that ED had pled guilty to rape, Principal Mann told TG's mother that he had to speak to legal counsel, but he thought ED would be able to attend both prom and graduation.

35. Later that afternoon, Principal Mann called TG's mother back and said that, based on advice from the District's legal counsel, the District would allow ED to attend all school functions, including prom and graduation.

36. In late May 2019, TG's mother posted on social media about the NWCSD's failure to protect her daughter from her rapist over the course of the school year. The next morning, she woke up to a hundred messages from other parents in the District, expressing concern that a rapist was in school with their children all year long.

37. Following the social media post, students at the High School organized and attended a walkout on May 31, 2019, expressing their anger with the way that the school handled the incident.

38. Rather than respond to the students' concerns, Principal Mann discouraged the walkout, and the school blocked doorways in an attempt to keep more students from participating.

39. In a video from that day, Principal Mann can be seen confronting TG's mother and saying that the walkout was not "civil," even though there was no unrest. In response, a female student objected, "Allowing all of us girls to be in danger is civil?"

40. Several students who participated in the walkout received suspensions.

41. Finally, at the conclusion of the school year, NWCSD expelled ED, but only after the walkout brought nationwide attention to the school's misconduct, which was reported in the New York Times and other publications across the country.

*The District Failed to Protect CC from Persistent Gender-Based Bullying*

42. CC experienced severe bullying during her time at the Middle School and High School.

43. Beginning in seventh grade, CC was bullied for wearing hoodies and dressing as a "tomboy" because she dressed in stereotypically male clothes. She was also called transgender and gay throughout middle school because of her clothing.

44. CC repeatedly went to the school counselor, Dr. Peters, and she would cry in his office about this harassment. Initially, Dr. Peters allowed her to come to his office to do her work when the bullying occurred; however, as time went on, Dr. Peters stopped helping her and told her to go back to class.

45. In ninth grade, CC began wearing more feminine clothing because of the harassment. However, the bullying did not stop, and bullies instead made comments about her more feminine clothing and called her "fat" and "ugly."

46. CC began attending school less and less because of the abuse that she was enduring at school. At one point, she walked by a lunch table and one of her bullies—who had harassed her for years—called her a "slut" and told her to kill herself.

47. Throughout the year, CC and her family repeatedly informed the school counselor, Dr. Peters, about what she was experiencing, but at no point did the District create a safety plan or document any efforts to protect CC from the ongoing bullying.

48. During this time, CC saw a counselor and a psychiatrist to help with the anxiety and depression that resulted from the harassment. She had never experienced any mental health problems before the bullying she experienced at school.

49. In December 2019, she stopped going to school altogether because of the ongoing bullying and the District's failure to stop it.

50. CC sought to attend a neighboring school, Niagara Falls, to be away from her bullies and near her friends, but NWCSD refused to let her transfer. Instead, the school called Child Protective Services to report that CC was not attending school.

51. Because she was not provided with any protection from harassment, CC left the High School permanently. To date, CC has not received her high school diploma.

*The District Failed to Protect AS From Classmates Who Physically Assaulted Her*

52. AS was attending the High School in Spring 2020 when she was bullied by members of the football team and their friends. One of the football players created and distributed a TikTok, in which he displayed messages from his teammates mocking AS. In the video, one boy comments that her sweatpants made it look like she has male genitalia, and another states that he wouldn't have sex with her.

53. After the video was distributed around the school, female students who were friends with the football players began harassing AS.

54. During a pep rally, the sophomore class performed a chant about AS, and five sophomore girls displayed a poster about her that said, "We don't want you."

55. At the conclusion of the pep rally, the five girls physically attacked AS, and she was hit in the head eleven times.

56. AS's mother immediately went to the principal's office and described to Acting Principal Jeff White what had happened. Mr. White noted that there would be a winter dance at the school the next day, and it would be in AS's best interest if she didn't go. Meanwhile, he permitted the students who assaulted her to go to the dance.

57. Several days passed, and no action was taken against the sophomore girls who had assaulted AS.

58. AS's mother repeatedly contacted the school and the superintendent to discuss what steps the District would take to protect her daughter, but no one responded to her.

59. AS was too afraid to go back to the High School, so the family located a private school for her to attend, requiring them to pay the new school's tuition.

*The District Failed to Protect LW from a Classmate Who Assaulted and Harassed Her*

60. In 2017, LW was sexually assaulted in her housing complex by a neighbor. At the time, LW was in second grade, and her assailant was in fifth grade at Errick Road Elementary School.

61. LW's mother reported the assault to law enforcement authorities, which resulted in a court placing the assailant on probation and requiring her to receive therapy. The court also ordered that the family move from LW's housing complex.

62. LW's mother informed the school principal, Nora O'Bryan, and the district superintendent, Daniel Ljiljanich about the incident and court proceedings, and requested that the school keep LW and the assailant apart, and LW safe.

63. The superintendent told LW's mother that the District would not do anything because the assailant was entitled to an education, and that LW and her mother would need to move if LW's mother wanted to protect LW from her assailant.

64. The assailant continued to harass LW at school where they had lunch together in the same place every day. The assailant would touch LW's arm when walking past her, and told LW that she was "damaged goods," and that "no one will ever love you."

65. The assailant also followed LW into the bathroom at school, and a teacher observed LW run out.

66. LW's mother attempted to contact the superintendent again, but he did not return her calls. She also continued to raise her concerns to the principal, but the principal did nothing to protect LW.

67. After the assailant moved out of the school district, other students bullied LW based on what the assailant told them about LW, including that LW was "damaged goods" and that LW enjoyed what the assailant had done to her.

68. As a result of the assault and continued sexual harassment, LW developed physical manifestations of stress, and had to attend counseling for more than two years.

*The District Fails to Protect All Students from Sexual Assault and Harassment*

69. The District has been notified of at least thirty incidents of sexual assault, harassment, or gender-based bullying in the last few years. Yet the District has not created a single written safety plan or documented any follow-up to ensure the safety of any of these students.

70. Nor has the District taken the most basic steps to prevent or respond to future sexual assaults, despite the nationwide attention to its mishandling of TG's rape.

71. The Rape Crisis Program at the YWCA for the Niagara Frontier offers educational programming on domestic and dating violence, as well as confidential advocacy for rape and sexual assault victims, to every school district in Niagara County—except for NWCSD. Despite being contacted numerous times by the YWCA with offers to provide these services to the district, the NWCSD has not only declined the offer but has refused to respond at all.

72. The District's refusal to take any steps to develop preventative policies or reform its practices indicates to all students that it will not protect them from sexual assault, harassment, or gender-based bullying and gives them a reasonable basis to believe they are, in fact, in danger.

## FIRST CAUSE OF ACTION

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681** *et seq.*

73. Plaintiff incorporates and realleges by reference paragraphs 1 to 72 of this Complaint.

74. NWCSD receives, and at all relevant times received, federal financial assistance.

75. The above-described acts and omissions by NWCSD, including acts and omissions carried out by its employees, violated students' rights under Title IX by discriminating on the basis of sex.

76. NWCSD and its officials had actual notice of repeated sex discrimination, sexual harassment, and sexual assault that was objectively severe, pervasive, and offensive such that it created a hostile educational environment.

77. Students and NWCSD have been deprived of educational benefits, including but not limited to class attendance, participation in school-sponsored activities, and a high school diploma, because of the discrimination and harassment they experienced.

78. NWCSD exhibited deliberate indifference to harassment on the basis of sex occurring in its schools.

79. NWCSD's violations of Title IX were the actual, direct, and proximate cause of educational, emotional, mental, and physical harm suffered by its students.

80. Accordingly, the OAG requests judgment in its favor against NWCSD as set forth in the Prayer for Relief.

## SECOND CAUSE OF ACTION

### Negligent Supervision

81. Plaintiff incorporates and realleges by reference paragraphs 1 to 72 of this Complaint.

82. NWCSD has a duty to exercise reasonable care over its students and to adequately supervise students.

83. The acts and omissions of NWCSD, as described above, breaches that duty.

84. Officials of NWCSD, including its employees, had notice of sex discrimination and sexual harassment taking place in its schools.

85. NWCSD's negligent supervision proximately caused emotional, mental, physical, and education harm to students. The harm experienced by students was a foreseeable

consequence of NWCSD's failure to discipline harassers and its failure to establish protection for victims.

86.     Accordingly, the OAG requests judgment in its favor against NWCSD as set forth in the Prayer for Relief.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that the Court:

A. Enjoin the District from unlawful negligence and discrimination against its students on the basis of sex;

B. Require the District to take all affirmative steps, including changing policies, conducting training, undergoing monitoring by this Court, among others, to ensure that defendants achieve compliance with Title IX, eliminate ongoing discrimination and its effects, and prevent discriminatory conduct in the future; and

C. Grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
August 23, 2021

        LETITIA JAMES
        Attorney General of the State of New York

       By: /s/ Sandra Pullman
         Sandra Pullman, Senior Counsel
         Amanda Meyer, Assistant Attorney General*
         Office of the New York State Attorney General
         Civil Rights Bureau
         28 Liberty St., 20th Floor
         New York, NY 10005
         (212) 416-8623
         Sandra.Pullman@ag.ny.gov