UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X      Case No. 21-759

People of the State of New York, by LETITIA JAMES,
Attorney General of the State of New York,

                                              Plaintiff,                        **MEMORANDUM**
                              -against-                                         **OF LAW**

NIAGARA WHEATFIELD CENTRAL SCHOOL DISTRICT,

                                              Defendant.

--------------------------------------------------------------------------X


### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORTIES ............................................................................. ii

STATEMENT OF FACTS ............................................................................. 1

ARGUMENT ............................................................................................... 4

I.   The OAG Has Sufficiently Alleged that the District Violated Title IX. ............................ 4

  a.   The harassment in the District was so severe, pervasive, and offensive that it denied the victims access to the educational program. ............................................................. 5

    1.   The harassment was severe, pervasive, and offensive. ............................................. 5

    2.   The harassment denied victims of educational benefits. ........................................... 10

  b.   The appropriate person had knowledge of the harassment. ......................................... 11

  c.   The district acted with deliberate indifference to the harassment. ................................ 12

II.   The OAG Has Sufficiently Alleged That the District Was Negligent. ............................... 14

  a.   School authorities had specific knowledge and notice. .............................................. 15

  b.   The District's negligence proximately caused the victims' injuries. .............................. 15

III.   The OAG May Seek Injunctive Relief on Its Negligent Supervision Claim ............... 16

IV.   The OAG Has Standing to Bring Its Claims .............................................................. 18

Conclusion ...................................................................................................... 24

## **TABLE OF AUTHORTIES**

PAGE

## **CASES**

*AA v. Hammondsport Cent. Sch. Dist.*, 527 F. Supp. 3d 501 (W.D.N.Y. 2021) ........................... 8

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982) ................................................ 18

*Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162 (2d Cir. 2012)........................... 4

*Anderson v. Bessemer City*, 470 U.S. 564 (1985)............................................................................ 4

*Bachynsky v. State*, 747 S.W.2d 868 (Tex. App. 1988).................................................................. 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................... 4

*Bostock v. Clayton Cty, Georgia*, 140 S. Ct. 1731 (2020) .............................................................. 9

*Bowen v. Rubin*, 385 F. Supp. 2d 168 (E.D.N.Y. 2005) ............................................................... 16

*Brodsky v. Trumbull Bd. of Educ.*, 2009 U.S. Dist. LEXIS 8799 (D. Conn. Jan. 30, 2009) ........ 10

*Brown v. Henderson*, 257 F.3d 246 (2d Cir. 2011)......................................................................... 5

*Bruneau v. South Kortright Cent. Sch. Dist.*, 163 F.3d 749 (2d Cir. 1998).................................. 12

*Burwell v. Pekin Cmty. High Sch. Dist.*, 213 F. Supp. 2d 917 (C.D. Ill. 2002).............................. 9

*Carabello v. N.Y.C. Dep't of Educ.*, 928 F. Supp. 2d 627 (E.D.N.Y. 2013)................................. 11

*Com. Of Mass. v. Bull HN Info. Systems, Inc.*, 16 F. Supp. 2d 90 (D. Mass. 1998).................... 24

*Davis v. Monroe City Board of Education*, 526 U.S. 629 (1999)..........................................Passim

*Doe ex rel. A.N. v. East Haven Bd. of Educ.*, 430 F. Supp. 2d 54 (D. Conn. 2006), *aff'd, Doe v. E.*
   *Haven Bd. of Educ.*, 200 F. App'x 46 (2d Cir. 2006) ................................................. 6, 8, 9, 11

*Doe ex rel Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226 (D. Conn. 2009) ....................... 11

*Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438 (D. Conn 2006)........................ 6, 13

*Doe ex rel. Doe v. Hamden Bd. of Educ.*, 2008 WL 2113345 (D. Conn. May 19, 2008) ........... 13

*Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443 (5th Cir. 1994)....................................................... 12

*Doe v. Univ. of Ky.*, 959 F.3d 246 (6th Cir. 2020) .......................................................... 7

*Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 89 N.Y.S.3d 295 (App. Div. 2018) .......... 15

*Gant v. Wallingford Bd. Of Educ.*,195 F.3d 134 (2d Cir. 1999) ............................................. 12

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) ...................................... 11

*Hayut v. State Univ. of N.Y.*, 352 F.3d 733 (2d Cir. 2003) ........................................... 11

*Hill v. Cundiff*, 797 F.3d 948 (11th Cir. 2015) ............................................................ 11

*Hoffman v. Coxsackie-Athens Cent. Sch. Dist.*, 894 N.Y.S.2d 559 (App. Div. 2010)............ 15, 16

*Incorporated Vill. of Garden City v. Genesco, Inc.*, No. 07-cv-5244, 2009 WL 3081724
   (E.D.N.Y. Sept. 23, 2009) ................................................................................... 16

*In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383
   (S.D.N.Y. 2021)................................................................................................... 16

*J.R. v. New York City Dep't of Educ.*, 2015 WL 5007918 (E.D.N.Y. Aug. 20, 2015)................ 5

*Kelly v. Yale Univ.*, 2003 WL 1563424 (D. Conn. 2003) ...................................... 6, 8, 12

*Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293 (2d Cir. 2021) ......................... 4

*Lynch v. City of New York*, 952 F.3d 67 (2d Cir. 2020).............................................. 4

*Mathis v. Bd. of Educ. of City of New York*, 7 N.Y.S.3d 182 (2015).................................. 14, 15

*People of the State of New York v. Mid Hudson Med. Grp., P.C.*, 877 F. Supp 143 (S.D.N.Y.
   1995) ................................................................................................... 20, 23, 24

*Mirand v. City of New York*, 84 N.Y.2d 44 (1994)............................................... 14, 15

*Motta ex rel. Motta v. Eldred Cent. Sch. Dist.*, 36 N.Y.S.3d 239 (2016) ................................ 15

*New York v. Utica City Sch. Dist.*, 177 F. Supp. 3d 739 (N.D.N.Y. 2016) .........................Passim

*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) ................................................ 5

*Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353 (S.D.N.Y. 2016) ......................... 5

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) ............................. 6

*Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123 (2d Cir. 2001)........................... 4

*Patricia H. v. Berkeley Unified Sch. Dist.*, 830 F. Supp. 1288 (N.D. Cal. 1993) ........................... 5

*People by Abrams v. Holiday Inns, Inc.*, 656 F. Supp. 675 (W.D.N.Y. 1984) ............................ 24

*People ex rel. Cuomo v. Liberty Mut. Ins. Co.*, 861 N.Y.S.2d 294 (App. Div. 2008) ................. 18

*People of the State of New York v. 11 Cornwell Co.*, 695 F.2d 34 (2d Cir. 1982), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983) .................................................................. 19, 20

*People v. Peter & John's Pump House, Inc.*, 914 F. Supp. 809 (N.D.N.Y. 1996) ............... Passim

*Picciano v. Nassau Cnty. Civil Serv. Comm'n*, 736 N.Y.S.2d 55 (App. Div. 2001) ................... 17

*Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135 (N.D.N.Y. 2011) .................. 5, 12, 13

*Support Ministries For Persons With AIDS, Inc. v. Vill. of Waterford, N.Y.*, 799 F. Supp. 272 (N.D.N.Y. 1992) ........................................................................................ 19, 24

*T.Z. v. City of New York*, 634 F. Supp. 2d 263 (E.D.N.Y. 2009) .................................................... 6

*Soriano v. Bd. of Educ.*, No. 01-cv-4961, 2004 U.S. Dist. LEXIS 21529 (E.D.N.Y. Oct. 27, 2004) ........................................................................................................ 13

*Torres v. LaLota*, 2017 WL 4457514 (E.D.N.Y. Aug. 14, 2017) ........................................... 16, 17

*Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601 (E.D.N.Y. 2011) ......................... 9

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC.*, 127 F. Supp. 3d 156 (S.D.N.Y. 2015) 23

*White v. Mitchell*, No. 99-cv-8519, 2001 WL 64756 (E.D.N.Y. Jan. 18, 2001) ......................... 16

*Williams v. Board of Regents*, 477 F.3d 1282 (11th Cir. 2007) ..................................................... 5

*Wilson ex rel. Wilson v. Vestal Cent. Sch. Dist.*, 825 N.Y.S.2d 159 (App. Div. 2006) ............... 15

*Zarda v. Altitute Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) ....................................................... 9

## STATUES

20 U.S.C. § 1682 ............................................................................................................ 1
20 U.S.C. § 1681(a) ....................................................................................................... 4
Gen. Mun. Law § 50-e ................................................................................................. 17

**<u>RULES</u>**

Fed. R. Civ. P. 12(b) ..................................................................................................... 4

Fed. R. Civ. P. 12(c) ................................................................................................ 4, 23

**<u>REGULATION</u>**

34 C.F.R. § 106.31(b)(7) ............................................................................................... 4

Defendant, the Niagara Wheatfield Central School District, begins its Motion for Judgment on the Pleadings by noting that the rape of a student by her classmate was very difficult for the District.  Yet it does not show that student the same compassion.

The District proceeds to downplay the more than thirty incidents of bullying, harassment, and assault identified in the pleadings—which caused students to drop out, to switch schools, and to experience depression and anxiety—by characterizing them as insufficiently harmful to require a response.  It further diminishes the State's interest in protecting the health and welfare of children in the District by miscasting the State's claims as if they concerned only four isolated incidents, when instead these incidents reveal the District's practice of failing to address such conduct.  Ultimately, the District asks this Court to find as a matter of law that its systemic failure to take any steps to ensure the safety of students who have experienced sexual assault, harassment, and bullying and who are at risk of experiencing the same is the future is undeniably reasonable .  That is not what the law provides.  Nor do any of the cases it cites support such an unjust outcome.

An accurate reading of the law demonstrates that the New York State Office of the Attorney General ("OAG") has sufficiently pled its basis for standing and the elements of its claim.

## **STATEMENT OF FACTS**

In the in  Plaintiff's First Amended Complaint ("FAC"), the OAG alleges that the District violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1682 et seq., and negligently supervised its students.  It identifies more than thirty incidents of sexual harassment, sexual assault, or gender-based bullying that occurred within the District.  FAC ¶¶ 5, 69.  The FAC alleges that, in response to these incidents, the District failed to take any documented effort to protect students who have been victim to rape, sexual assault, and/or sexual harassment.  *Id.*  As examples, the FAC provided greater detail about four victims: TG, CC, AS, and LW.

**TG:**  In May 2018, TG was raped at her home by a male classmate, ED.  *Id.* ¶ 16.  ED was arrested after TG reported the incident, and TG was also granted a restraining order against him. *Id.* ¶ 17-18.  When TG's mother met with the principal and informed him of the rape and the restraining order, he told her that ED would not be punished and created no plan to ensure ED was kept away from TG.  *Id.* ¶¶ 20-21.  ED continued to harass TG by deliberately seeking her out in the halls.  *Id.* ¶ 22.  TG informed her guidance counselor, but no action was taken; as a result, TG suffered a panic attack while at school.  *Id.* ¶ 23.  ED and other students continued to harass TG for the remainder of the school year, but no discipline was issued.  *Id.* ¶¶ 27-28, 30.

In May 2019, ED pled guilty to third-degree rape.  *Id.* ¶ 32.  The school was notified, but took no action; ED was allowed to attend all school functions, including prom and graduation.  *Id.* ¶ 33-35.  ED was only disciplined at the conclusion of the school year, after national media reported on a student-led walkout that protested the District's inaction.  *Id.* ¶¶ 36-41.

**CC:** CC was severely bullied during her time at the middle school and high school in the District.  *Id.* ¶ 42.  Beginning in seventh grade, she was mocked for dressing as a tomboy, wrongly called "transgender," and subject to frequent insults from fellow students.  *Id.* ¶ 43.  CC sought the help of a school counselor, who initially let CC work in his office but eventually stopped and told her to go back to class.  *Id.* ¶ 44.  In ninth grade, CC began dressing in a more feminine way due to the harassment, but the bullying continued, with students telling her she was "fat," "ugly," a "slut," and that she should kill herself.  *Id.* ¶ 45.  CC's parents informed the District of the persistent harassment, but the administration failed to take any action to protect her.  *Id.* ¶ 47.

CC began attending school less and less and eventually stopped attending altogether.  *Id.* ¶¶ 46, 49. CC sought to transfer to another school, but the District refused to allow her to transfer.

Instead, the District called Child Protective Services to report that CC was not attending school. *Id.* ¶ 50-51.  To date, CC has not received her high school diploma.  *Id.* ¶ 51.

**AS:**  In Spring 2020, AS was severely bullied.  Members of the high school football team created and distributed a TikTok video that mocked her appearance, discussed whether they would have sex with her, and made comments about her genitalia.  *Id.* ¶ 52.  After the video was distributed, more students began bullying AS.  *Id.* ¶ 53.  Finally, at a school pep rally, a group of students held a sign targeting AS that read, "we don't want you."  *Id.* ¶ 54.  Following the pep rally, AS was physically assaulted by the group of students.  *Id.* ¶ 55.

AS's mother informed the principal of the attack, but rather than take disciplinary action, he informed AS's mother she should not attend an upcoming school dance—yet her attackers were allowed to attend.  *Id.* ¶ 56.  AS's mother repeatedly contacted the school to discuss how to protect her daughter, but her calls went unanswered.  *Id.* ¶ 57.  Ultimately, AS was too afraid to continue her education at the District and located an alternative, private school for her to attend.  *Id.* ¶ 59.

**LW:**  In 2017, a second-grade student, LW, was sexually assaulted in her housing complex by a fifth-grade student.  *Id.* ¶ 60.  After LW's mother reported the incident to law enforcement, the assailant was placed on probation.  *Id.* ¶ 61.  LW's mother also informed the principal and the District superintendent about the assault, asking them to help keep her daughter safe.  *Id.* ¶ 62.  She was told that the District would not take any action against the assailant.  *Id.* ¶ 63.

Meanwhile, at school, LW continued to be mocked and harassed by her attacker.  *Id.* ¶ 64.  Even after the assailant relocated to another school district, LW continued to be harassed by other students based on what the assailant had told them.  *Id.* ¶ 67.  The District failed to take any action, despite LW's mother repeatedly reporting the harassment.  LW developed physical manifestations of stress and needed years of counseling as a result.  *Id.* ¶ 68.

## ARGUMENT

The standard for evaluating a Fed. R. Civ. P. 12(c) motion is identical to the standard used for evaluating motions brought under Fed. R. Civ. P. 12(b). *See Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). Thus, a 12(c) motion should not be granted in cases where a plaintiff's complaint contains sufficient facts, accepted as true, to state a claim for relief that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

In making this determination, a court must draw all reasonable inferences in the plaintiff's favor and analyze the factual allegations to determine whether there is a "reasonable expectation that discovery will reveal evidence of illegal conduct." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). This reasonable expectation is rooted in the "plausibility" that a defendant acted unlawfully and acknowledges the possibility that "a given set of actions will be subject to diverging interpretations." *Id*. (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)). The choice between plausible inferences that may be draw from factual allegations is "not a choice to be made on a [12(c)] motion." *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 184-85 (2d Cir. 2012). Thus, a 12(c) dismissal should not be granted in circumstances where there are questions of fact still in dispute. *See Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301-02 (2d Cir. 2021).

## I.     The OAG Has Sufficiently Alleged that the District Violated Title IX.

Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex by an educational program receiving federal financial assistance. 20 U.S.C. § 1681(a). The implementing regulations of Title IX forbid any sex-based limitation "in the enjoyment of any right, privilege, advantage or opportunity" related to federally funded education. 34 C.F.R. § 106.31(b)(7). This mandate is as expansive as it sounds. "The Supreme Court has directed federal

courts to interpret Title IX to give it a sweep as broad as its language." *Patricia H. v. Berkeley Unified Sch. Dist.,* 830 F. Supp. 1288, 1289–90 (N.D. Cal. 1993) (citing *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521 (1982)).

The Second Circuit has made clear that harassment of a student by classmates following a sexual assault can constitute unlawful sex discrimination under Title IX. *Doe v. E. Haven Bd. of Educ.,* 200 F. App'x 46, 48 (2d Cir. 2006). Harassment based on sex stereotypes can also establish a Title IX claim. *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 364 (S.D.N.Y. 2016); *see also Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135, 151 (N.D.N.Y. 2011) (finding that "harassment based on nonconformity with sex stereotypes is a legally cognizable claim under Title IX"); *J.R. v. New York City Dep't of Educ.*, No. 14 CIV. 0392, 2015 WL 5007918, at *6 (E.D.N.Y. Aug. 20, 2015).

To establish that a school district violated Title IX for its handling of sexual harassment, plaintiffs must show (1) that the alleged harassment was so severe, pervasive and objectively offensive that it barred the victim's access to an educational benefit; (2) that the appropriate person in the district had knowledge of the alleged harassment; and (3) that the district acted with deliberate indifference to the harassment. *Williams v. Board of Regents*, 477 F.3d 1282 (11th Cir. 2007) (citing *Davis v. Monroe City Board of Education*, 526 U.S. 629 (1999)). As discussed below, The OAG has sufficiently alleged all of the elements of its Title IX claim.

### a. The harassment in the District was so severe, pervasive, and offensive that it denied the victims access to the educational program.

#### 1. *The harassment was severe, pervasive, and offensive.*

Establishing that student-on-student harassment was sufficiently "severe, pervasive and offensive," under Title IX requires a highly fact-specific inquiry into the underlying harassment. *T.Z. v. City of New York*, 634 F. Supp. 2d 263, 269 (E.D.N.Y. 2009); *Davis*, 526 U.S. at 651

("Whether gender-oriented conduct rises to the level of actionable harassment…depends on a constellation of surrounding circumstances, expectations and relationships") (quoting *Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75, 82 (1998)).  There are several ways in which a plaintiff can meet this standard, all of which are alleged here.

First, while the "pervasiveness" standard typically demands a pattern of harassing conduct, single instances of serious sexual assault, such as rape or coerced sexual contact, can be sufficient to establish a Title IX claim.  *T.Z.*, 634 F. Supp. 2d at 270-272.

Here, TG was raped by a classmate, FAC ¶ 16-41; LW was sexually assaulted, *id.* ¶ 60-68; AS was attacked by multiple students, *id.* ¶ 52-59, and among the additional 30 incidents, misconduct ranged forcible sexual touching, physical assault, and death threats.  There is simply no way to rule as a matter of law that these incidents are not sufficiently severe and pervasive.

Second, apart from these indvidual egregious incidents, the OAG can also establish Title IX claims by showing a pattern of harassing conduct that preceded or followed a sexual assault. For instance, courts have found that "deliberate indifference to known post-assault harassment" can establish Title IX liability.  *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 444 (D. Conn. 2006).  Notably, forcing a student to continue attending school in close proximity to her assailant can be enough to establish a Title IX claim.  *Kelly v. Yale Univ.*, 2003 WL 1563424, at *3 (D. Conn. 2003) (finding that the mere presence of the plaintiff's assailant was harassing because "it exposed [her] to the possibility of an encounter with him").  Peer harassment after reporting a sexual assault can also give rise to a Title IX violation.  *Doe ex rel. A.N. v. East Haven Bd. of Educ.*, 430 F. Supp. 2d 54, 60 (D. Conn. 2006)., *aff'd*, 200 F. App'x 46, 48 (2d Cir. 2006).

The District's failure to keep TG's rapist and LW's assailant away from them while at school, in the aftermath of serious sexual assaults, FAC ¶¶ 69-72, is sufficient to establish the

requisite level of harassment under Title IX.  Both TG and LW were also subjected to subsequent harassment by their peers related to the rape, *id.* ¶¶ 14-72, which supports a Title IX claim.

The District's cite to a Sixth Circuit summary judgment ruling does not support its contention that this case should be disposed of on the pleadings.  *See Doe v. Univ. of Ky.*, 959 F.3d 246, 251- 52 (6th Cir. 2020).  Unlike in TG's case, where the perpetrator pled guilty to raping her, the accused in *Univ. of Ky.* was found to be innocent of the alleged sexual assault.  *Id.* at 249.  Further, the district in *Univ. of Ky.* promptly investigated the allegations of assault, immediately issued a no-contact order, investigated alleged violations of the order, and expelled a second assailant who was found to have committed assault.  *Id.* at 250.  Finally, unlike TG and LW, the plaintiff there did not experience additional harassment from other students related to the rape.  *Id.* at 251.

The District's attempt to rely on *Carabello v. N.Y.C. Dep't of Educ.*, 928 F. Supp. 2d 627 (E.D.N.Y. 2013) also fails.  In *Carabello*, the court granted summary judgment after development of a full factual record and concluded that a single incident of over-the-clothes touching by a classmate, with no subsequent harassment by the assailant, was not severe and pervasive.  *Id.* at 643.  The court also found that the District's response was "expeditious and effective."  *Id.* at 642.  There, the school immediately suspended the assailant for a year, which "prevented any further abuse" against the victim.  *Id*.  Here, the District took no such action to protect TG from her rapist, LW from her assailant, AS from her attackers, or CC from her bullies.  Nor did it take any steps to protect the thirty additional students.

Oddly enough, in arguing that the sexual assault of LW did not give rise to any obligation on the part of the District to respond, the District cites to a case that stands for precisely the opposite.  In *AA v. Hammondsport Cent. Sch. Dist.*, 527 F. Supp. 3d 501, 512 (W.D.N.Y. 2021),

the court found that the District could face liability for its failure to protect a victim from her attacker, after it was aware of the initial assault and the existence of a protective order. Citing *Kelly v. Yale*, 2003 WL 1563424 at *3, Judge Larimer denied the Defendant's motion to dismiss the Title IX claim on the grounds that, after the District "received notice of the [initial] harassing conduct, it had a duty under Title IX to take some action to prevent the further harassment" in a manner that was not "clearly unreasonable." There, the District did not keep the victim away from her assailant, "at which point he openly mocked and ridiculed her in front of other students for having reported the assault, and recruited other students to do the same." *Id.* at 512. As here, the plaintiff alleged that the District permitted her harasser to roam the school with impunity, where she encountered and was menaced by him on multiple occasions. *Id.* She alleged that as a result, she suffered humiliation, shame, anxiety, guilt, depression, and emotional distress, lost all enjoyment of usual activities, and was ultimately forced to enroll in a different school in order to feel safe. *Id.* Judge Larimer noted that these allegations were sufficient to establish "a pervasive, ongoing and unchecked campaign of harassment" and held that the District's refusal to take action against a perpetrator "who the District was aware had sexually assaulted [plaintiff] in school, and against whom a protective order had been issued, are sufficient to state a claim under Title IX against the District with respect to the post-assault incidents of harassment against [plaintiff] by her attacker and by others he recruited." *Id.* at 512. The same logic clearly applies here.

Third, ongoing bullying related to a student's sexuality can give rise to a Title IX claim. In *Doe ex rel. A.N. v. East Haven Bd. of Educ.*, 430 F. Supp. 2d at 60 (D. Conn. 2006), taunting of a victim by classmates who called her "a slut, a douche bag, a liar" and other slurs was sufficient to permit a jury to find that she had been subjected to severe and pervasive harassment.

Here, CC experienced gender-based bullying nearly identical to that in *Doe*, FAC ¶¶ 42-51, and AS was physically assaulted and also subjected to bullying by students who talked about her attractiveness and whether they would want to have sex with her. *Id.* ¶¶ 52-59.

In arguing that such allegations can be dismissed on the pleadings, the District attempts to rely on another summary judgment ruling from out of the Second Circuit, but this, too, fails. In *Burwell v. Pekin Cmty. High Sch. Dist.*, 213 F. Supp. 2d 917, 930 (C.D. Ill. 2002), based on a lengthy factual record, the court found that the plaintiff had not reported any of the allegedly gender-based insults to the school, and further found that it was part of a larger conflict between the plaintiff, her brother, and classmates. *Burwell* simply does not stand for the principle that gender-based bullying can never constitute actionable sex harassment under Title IX.

The District next cites *Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 629 (E.D.N.Y. 2011) for the purported proposition that insults and name-calling regarding a student's sexual orientation are not actionable under Title IX. However, this proposition was since overruled by *Zarda v. Altitute Express, Inc.* 883 F.3d 100 (2d Cir. 2018), which held that a prohibition of discrimination "on the basis of sex" extends to the basis of sexual orientation. *See also Bostock v. Clayton Cty, Georgia*, 140 S. Ct. 1731, 1741-43 (2020) (holding that discrimination on the basis of sexuality constitutes discrimination on the basis of sex under Title VII). To the extent *Tyrell* characterized other, potentially sex-based insults as not severe or offensive, it referred only to a two-week period of name-calling, about which the Defendant was not clearly aware. Here, CC experienced years of bullying, about which she repeatedly notified her guidance counselor, and which caused her to develop severe depression and anxiety and ultimately drop out of school. FAC ¶¶ 44, 48.

Next, the District cites *Brodsky v. Trumbull Bd. of Educ.*, 2009 U.S. Dist. LEXIS 8799, at *19-*20 (D. Conn. Jan. 30, 2009) for the purported proposition that gender-based bullying cannot be severe and pervasive as a matter of law.  This is incorrect.  To the contrary, the court in *Brodsky* noted, "Depending on the context, the use of gendered or sexually loaded insults such as 'bitch,' 'whore,' 'prude,' and 'slut' can certainly be indicative of animus on the basis of sex." *Id.* at *7. The court based its ruling on a finding that the defendants "acted reasonably and expeditiously" to respond.  There, the defendants took numerous steps, including issuing punishments, meeting with the parents and teachers of the students, separating the students and increasing supervision of their interactions, providing counseling to the victim, and conducting an investigation into the allegations of bullying.  *Id.* at *8.  Here, the District took no such steps.

Nonetheless, in the absence of any fact development, the District asks this Court to hold that none of the following can ever be severe or pervasive: ongoing harassment of a victim over an entire year by her rapist and fellow classmates; years of gender-based bullying that caused a victim depression and anxiety; physical assault on school grounds by multiple students; and continuing harassment of a victim following a sexual assault.  The District also asks this Court to ignore the OAG's allegation of at least thirty additional incidents of gender-based bullying and sexual harassment.  Neither the law nor the facts support such a request.

2.  *The harassment denied victims of educational benefits.*

The OAG has alleged that victims were denied educational benefits.  *Davis*, 526 U.S. at 650 (plaintiff must show that the results of the harassment "so undermine[d] and detract[ed] from [her] educational experience that [she was] effectively denied equal access to an institution's resources and opportunities.").  In *Davis*, the student in question experienced a decrease in her grades, was unable to concentrate in class, and experienced suicidal ideation.  *Id*. at 643.  Other

courts have found that absence from school or class due to distress or fear are indicators of a hostile educational environment, relative to other students. *Doe ex rel. A.N.*, 430 F. Supp. 2d at 60.

All of the identified victims were denied educational benefits. TG experienced panic attacks and missed school as a result of her encounters with her rapist and harassment by classmates. FAC ¶¶ 23, 29. CC started going to school as little as twice a month due to the bullying, and then she ultimately dropped out altogether. *Id.* ¶¶ 46, 49. She was also denied the chance to get her degree when the District refused to let her transfer to Niagara Falls instead. *Id.* ¶ 50. AS left the District entirely after the District refused to take any steps to keep her safe from the multiple students attacked her at a pep rally on school grounds. *Id.* ¶ 55. LW developed physical manifestations of stress as a result of the assault and continued sexual harassment she experienced, and she had to attend counseling for more than two years. *Id.* ¶ 68. There is no support for the District's position that, as a matter of law, none of these students were deprived of educational benefits.

**b.   The appropriate person had knowledge of the harassment.**

"[A]n 'appropriate person'… is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). This can include any member of the staff with corrective authority over students; courts have found the knowledge of principals, assistant principals, or Title IX coordinators to be sufficient. *Doe ex rel Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 229 (D. Conn. 2009); *Hill v. Cundiff*, 797 F.3d 948, 971 (11th Cir. 2015); *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 750-51 (2d Cir. 2003).

The District does not seem to contest that it had knowledge of the thirty incidents of harassment, bullying, and assault. As to the four students identified by initials, they and their

families informed the principal, guidance counselors, the assistant principal and others about ongoing harassment and concerns about their safety, but the District did not address their concerns. FAC ¶ 72.  There is no basis to rule, as a matter of law, that the District lacked notice of the gender-based hostile environment described in the Complaint.

   c.    **The District acted with deliberate indifference to the harassment.**

   Title IX requires schools to adequately respond to knowledge of student-on-student sexual harassment.   School officials fail to meet their obligation to respond when they approach allegations of sexual harassment with "deliberate indifference." *Gant v. Wallingford Bd. Of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999) (*quoting Davis*, 526 U.S. at 648).   Deliberate indifference includes school actions that are "clearly unreasonable in light of known circumstances" and taken only after a "lengthy and unjustified delay."  *Id.*; *Bruneau v. South Kortright Cent. Sch. Dist.*, 163 F.3d 749, 761 (2d Cir. 1998).

   This is a fact-intensive inquiry.  There are no bright-line rules for determining whether the actions of school officials are clearly unreasonable and unjustifiably delayed.  *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 456 n.12 (5th Cir. 1994).   However, the school's conduct must, at a minimum, "cause students to undergo harassment or make them liable or vulnerable to it."  *Davis*, 526 U.S. at 644-45.  Courts have generally found that schools make students vulnerable to peer harassment if they fail to make an effort to remedy that harassment.  *Kelly*, 2003 WL 1563424, at *4 (finding deliberate indifference where university refused to consider academic and residential accommodations that would prevent victim from encountering her assailant); *see also Pratt*, 803 F. Supp. 2d at 152 (finding that a school was deliberately indifferent when it "failed to respond to the sexist harassment despite responding to harassment of other students on other grounds").

Similarly, delayed responses to sexual assault that make a student vulnerable to further harassment can suggest deliberate indifference. *Doe ex rel. Doe v. Hamden Bd. of Educ.*, No. 06-civ-1680, 2008 WL 2113345 at *6-7 (D. Conn. May 19, 2008) (finding unreasonable delay where assailant remained in school without discipline despite being arrested for sexual assault); *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 447 (D. Conn 2006) (finding unreasonable delay where district did not suspend student until several weeks after assault).

Again, the District attempts to rely on a summary judgment ruling to assert a rule of law that simply does not exist. In *Soriano v. Bd. of Educ.*, No. 01-civ-4961, 2004 U.S. Dist. LEXIS 21529, at *21 (E.D.N.Y. Oct. 27, 2004), the court discussed the lack of severity of two separate incidents over six months and observed that no additional harassing conduct occurred after the second incident. The court did not hold that declining grades and mental health treatment do not constitute a denial of access to the school's resources and benefits under Title IX.

It is clear that the District was deliberately indifferent to severe and pervasive harassment because it took no steps at all to keep students safe. First, despite being on notice of more than thirty incidents of sexual assault, harassment, or gender-based bullying, the District has not taken any documented effort to keep students safe. This is not a reasonable response as a matter of law.

Next, with respect to the specific students referenced in the Complaint, the District, the school was deliberately indifferent. After being informed that ED pled guilty to raping TG, the District did not suspend him for a single day; planned to allow him to attend prom and graduation; and only expelled him after nationwide coverage of the walkout. FAC ¶¶ 20-21, 35, 41. The school's eventual disciplinary action against TG's rapist was so delayed—approximately nine months after her mother notified the school of the charges and the restraining order—that it clearly falls within the definition of a "delayed response." The school district was also deliberately

indifferent to the bullying that CC endured for several years, when it took no steps to ensure her safety, despite being repeatedly notified about it. *Id.* ¶¶ 44, 47. Its decision to call Child Protective Services regarding CC's family rather than permit her to transfer schools was particularly egregious. *Id.* ¶ 50. With respect to AS, the school's failure to discipline any of the assailants or protect her, after she had been beaten over the head numerous times at a school function, was clearly unreasonable. *Id.* ¶¶ 55-58. Finally, the District took no steps at all to protect LW from her assailant, despite being notified of the charges against her, nor did it take any steps to address the post-assault bullying she experienced from fellow classmates. *Id.* ¶¶ 63-67. This inaction in the face of a severe and pervasive sexual harassment is patently unreasonable.

## II.     The OAG Has Sufficiently Alleged That the District Was Negligent.

The OAG has also sufficiently alleged that the District has violated its duty to adequately supervise its students. Under New York state common law, "[s]chools are under a duty to adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of supervision." *Mirand v. City of New York*, 84 N.Y.2d 44, 49 (1994). First, "[i]n determining whether the duty to provide adequate supervision has been breached in the context of injuries caused by the acts of fellow students, it must be established that school authorities had sufficiently specific knowledge or notice of the dangerous conduct which caused injury." *Id.*; *see also Mathis v. Bd. of Educ. of City of New York*, 7 N.Y.S.3d 182, 184 (2015). Second, plaintiffs must also establish that the school's "breach of the duty to provide adequate supervision was a proximate cause of the injuries sustained." *Mathis*, 7 N.Y.S.3d at 184. The OAG has adequately pled both elements of the negligent supervision claim, as discussed below.

### a. School authorities had specific knowledge and notice.

To show that a school had specific knowledge or notice of the harmful behavior, "notice to the school of prior similar conduct is usually required." *Mathis*, 7 N.Y.S.3d at 184. Specific knowledge on the part of principals, guidance counselors, or teachers generally satisfies this element. *See Motta ex rel. Motta v. Eldred Cent. Sch. Dist.*, 36 N.Y.S.3d 239, 242 (2016) (finding the school district had sufficient knowledge when the principal and guidance counselor were made aware of prior incidents); *Mirand*, 84 N.Y.2d at 50 (finding that the district had notice when one of its teachers was made expressly aware of a prior altercation).

The victims identified in the FAC notified the superintendent, principals, and guidance counselors of the ongoing harassment and bullying, yet the District took no action. FAC ¶¶ 14-72. It was also on notice of the thirty additional incidents, but it took no steps to keep the victims safe.

### b. The District's negligence proximately caused the victims' injuries.

For a negligent supervision claim, a plaintiff must also establish that the defendant's breach of their duty of care proximately caused the injuries sustained. *Mirand*, 84 N.Y.2d at 49. The test for proximate causation is whether "under all the circumstances the chain of events that followed the negligent act or omission was a normal or foreseeable consequence of the situation created by the school's negligence." *Id.* at 50. The injuries associated with negligent supervision can be physical, but they can also be emotional and mental. *See, e.g.*, *Motta*, 36 N.Y.S.3d at 241.

Claims that a harasser repeatedly targeted his or her victim have created a triable issue of fact as to whether the harm was a foreseeable consequence of the school's negligence. *See Wilson ex rel. Wilson v. Vestal Cent. Sch. Dist.*, 825 N.Y.S.2d 159, 161 (App. Div. 2006); *Hoffman v. Coxsackie-Athens Cent. Sch. Dist.*, 894 N.Y.S.2d 559 (App. Div. 2010); *Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 89 N.Y.S.3d 295, 299 (App. Div. 2018).

The District claims that it could not have known about any of the harassment described in the Complaint, that it was not obligated to respond, and that its action caused no harm to students, despite all allegations to the contrary.  Their arguments have no merit.

### III.    The OAG May Seek Injunctive Relief on its Negligent Supervision Claim

The District is wrong that the OAG cannot seek injunctive relief to redress its negligent supervision claim.  Def.'s Mem. at 21-22.  Courts routinely allow litigants, including the OAG, to pursue claims for injunctive relief for negligent supervision or other negligence claims.  *See, e.g.*, *Incorporated Vill. of Garden City v. Genesco, Inc.*, No. 07-cv-5244, 2009 WL 3081724, at *7 (E.D.N.Y. Sept. 23, 2009) (reinstating plaintiff's negligence claim insofar as it seeks injunctive relief even though plaintiff's request for damages was time-barred); *White v. Mitchell*, No. 99-cv-8519, 2001 WL 64756, at *4 (E.D.N.Y. Jan. 18, 2001) (refusing to dismiss claim of negligent supervision seeking, among other things, injunctive relief against defendants in their individual capacities); *Bowen v. Rubin*, 385 F. Supp. 2d 168, 181-82 (E.D.N.Y. 2005) (allowing claim for negligent supervision to proceed where the plaintiff sought injunctive relief related to its federal claim).  As most relevant here, the Court in *In re New York City Policing During Summer 2020 Demonstrations*, recently denied the defendants' motion to dismiss the OAG's claims, including for negligent supervision, while explicitly recognizing that the OAG "seeks only declaratory and injunctive relief."  548 F. Supp. 3d 383, 399 (S.D.N.Y. 2021).[1]

---

[1] Indeed, the District cites no New York cases to support the proposition that the OAG cannot seek injunctive relief for its negligent supervision claim.  Instead, the District relies on a Texas state law case that is clearly inapposite.  The Texas Court's decision in *Bachynsky v. State* concerned a cause of action for negligence in prescribing a drug, and the Court made clear that its holding regarding *parens patriae* and negligence was limited to "the context of [the] case," including because "equity need not intervene in negligence actions in which full relief is afforded by law through damages."  747 S.W.2d 868, 869 (Tex. App. 1988).  As described above, however, New York courts allow litigants to seek injunctive relief for claims of negligence.

The District is also wrong that the "OAG opted to seek only injunctive relief in this action . . . because it failed to comply with New York's notice of claim requirement for money damage claims against a municipal organization."  Def.'s Mem. at 22 (*citing* Gen. Mun. Law § 50-e).  It is well settled that "[u]nder [General Municipal Law] Section 50-e notice is not necessary for equitable claims, such as injunctive relief."  *Torres v. LaLota*, No. 15-cv-7097, 2017 WL 4457514, at *8 (E.D.N.Y. Aug. 14, 2017) (collecting state cases).  "Nor is a notice of claim required 'to restrain a continuing wrong by the municipality . . . .'"  *Id.* (*quoting Picciano v. Nassau Cnty. Civil Serv. Comm'n*, 736 N.Y.S.2d 55, 62 (App. Div. 2001)).  Accordingly, notice was not required under General Municipal Law Section 50-e for the injunctive relief sought here.

Finally, courts routinely allow the OAG to seek injunctive relief rather than money damages to obtain "the complete relief that the State seeks" and "protect [the] societal interests" to which it is charged with vindicating.  *People v. Peter & John's Pump House, Inc.*, 914 F. Supp. 809, 813 (N.D.N.Y. 1996) (explaining that "the interests of the State and private individuals are not coextensive because the State seeks to enjoin the [defendant's] overall practice and policy of discrimination whereas individual plaintiffs would have much narrower interests" including in that they "might not achieve the complete relief that the State seeks because they have a greater incentive to compromise requests for injunctive relief in exchange for money damages"); *see also New York v. Utica City Sch. Dist.*, 177 F. Supp. 3d 739, 748-49 (N.D.N.Y. 2016) (holding that "the complaint sufficiently alleges that the prospective injunctive relief sought by the OAG would vindicate the State's quasi-sovereign interest in protecting its [ ] immigrant community from discrimination in education").  Here, contrary to the District's suggestion otherwise, Def.'s Mem.

at 21-22, monetary damages are clearly not adequate to vindicate the OAG's interest in ensuring that students in the District are free from discrimination and negligence in the future.[2]

## IV.    The OAG Has Standing to Bring its Claims

Defendant's challenges to the OAG's standing ignore or misconstrue the OAG's interests. Def.'s Mem. at 5-10.  The OAG has standing to bring suit under its well-established *parens patriae* authority, which is "the common-law principle that a sovereign, as parent of the country, may step in on behalf of its citizens to prevent injury to those who cannot protect themselves." *Utica City Sch. Dist.*, 177 F. Supp. 3d at 747; *see also People ex rel. Cuomo v. Liberty Mut. Ins. Co.*, 861 N.Y.S.2d 294, 296 (App. Div. 2008) ("The State has inherent authority to act in a *parens patriae* capacity when it suffers an injury to a quasi-sovereign interest" (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982))).

Where, as here, the OAG invokes standing under the *parens patriae* doctrine it must "(1) articulate[ ] a quasi-sovereign interest' apart from the interests of particular parties; (2) allege[ ] a concrete injury to a substantial segment of its population; and (3) demonstrate[ ] that complete relief from that injury could not be obtained by individuals in a private lawsuit." *Utica City Sch. Dist.*, 177 F. Supp. 3d at 748.  The OAG meets these requirements here.

Defendant does not challenge the OAG's ability to meet the first and third requirements of *parens patriae* standing.[3]  Nor could it.  With respect to the first requirement, courts have repeatedly made clear that the OAG has a quasi-sovereign interest in protecting the health and well-being of its citizens, including from "a broad range of discrimination." *See, e.g.*, *Utica City*

---

[2] The cases that the District cites for the general proposition "that injunctive relief is not available when an adequate remedy at law exists" are not to the contrary.  Def.'s Mem. at 21-22.

[3] To the extent Defendant's reference to TG's lawsuit may be construed as an argument that the OAG does not meet the first requirement of standing under *parens patriae* insofar as it is a nominal party, *see* Def.'s Mem. at 6, such argument fails for the reasons explained above.

*Sch. Dist.*, 177 F. Supp. 3d at 747-48 (holding the OAG had statutory and *parens patriae* authority to sue to address discrimination against immigrant students under federal and state law); *Peter & John's Pump House, Inc.*, 914 F. Supp. at 812 (noting that the Second Circuit has expressly acknowledged New York's quasi-sovereign interest in "preventing racial discrimination of its citizens"); *Support Ministries For Persons With AIDS, Inc. v. Vill. of Waterford, N.Y.*, 799 F. Supp. 272, 277 (N.D.N.Y. 1992) (finding standing where defendants' discriminatory conduct endangered health and subjected individuals to an increased risk of homelessness); *People of the State of New York v. 11 Cornwell Co.,* 695 F.2d 34, 40 (2d Cir. 1982), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983) (finding standing for discrimination against individuals with disabilities).

With respect to the third requirement, the OAG has a "unique status as the representative of the greater public good and [a] concomitant mandate to secure wide-ranging relief that will inure to the direct and indirect benefit of the broader community." *Utica City Sch. Dist.*, 177 F. Supp. 3d at 753-54.[4]  The OAG seeks injunctive relief to redress harms to students victimized by gender violence and to prevent such harms from happening in the future by requiring the District to reform its policies, conduct training on those policies and related practices, and undergo monitoring to ensure compliance with the law.  *See* FAC Prayer for Relief.  Such relief squarely falls within the types of relief courts have held "would vindicate the State's quasi-sovereign interest in protecting its [communities] from discrimination in education." *Utica Cent. Sch. Dist.*, 177 F. Supp. 3d at 748-49 (finding the request "to hire an enrollment ombudsman as well as to impose certain pre-clearance requirements that must be met by the [defendant school district] when

---

[4] The third requirement imposes "only a slight burden" on the OAG, and "stands for the simple proposition that *parens patriae* standing is improper where the state is merely a minimal party." *Utica City Sch. Dist.*, 177 F. Supp. 3d at 74.

it desires to make changes to its ESL arrangements" satisfied the third requirement); *cf. People of the State of New York v. Mid Hudson Med. Grp., P.C.*, 877 F. Supp. at 149 (finding "that the remote possibility that [a private plaintiff] could obtain relief for himself does not preclude the Attorney General from seeking complete relief for all current and future deaf patients and their families").

Conceding that the OAG clearly meets the first and third requirements of standing under *parens patriae*, the District only challenges the OAG's ability to meet the second requirement on the mistaken basis that the OAG has not alleged a concrete injury to a substantial segment of the population. *See* Def.'s Mem. at 6. The District is wrong both on the law and the facts.

As the District acknowledges, "[t]here is no numerical talisman to establish *parens patriae* standing." *Peter & John's Pump House*, 914 F. Supp. at 812; *see also Utica Cent. Sch. Dist.*, 177 F. Supp. 3d at 748 (same). Indeed, the "'raw number of individuals directly involved'" in the alleged discrimination . . . is not determinative." *Peter & John's Pump House, Inc.*, 914 F. Supp. at 812 (*quoting Mid Hudson Med. Grp.*, *P.C.,* 877 F. Supp. at 148)). Instead, courts in the Second Circuit "broadly construe" the 'substantial segment' requirement of *parens patriae* standing," and look not merely at the number of individuals allegedly involved in the discrimination at issue but at whether "the community at large also would be affected 'were [the relevant] incident[s] [were to be] tolerated without redress.'" *Id.* (*quoting 11 Cornwell Co.*, 695 F.2d at 39-40) (collecting cases). Accordingly, courts have found that the OAG has standing where it has "alleged injury to more than an identifiable group of individual residents," and "alleges a 'practice and policy' of discrimination, which necessarily involves a larger group of patrons." *Peter & John's Pump House, Inc.*, 914 F. Supp. 809 at 813.

Here, the OAG clearly meets its burden to plead that a substantial segment of the population is affected by the District's discrimination and negligence based on gender. The OAG alleges that

despite the District's legal and moral obligations to "take steps to protect students from gender-based harassment and sexual assault that create a hostile educational environment and deprive students of educational opportunities" and to "provide adequate supervision of their students to protect them from harm," that the District has "deliberately and callously ignored complaints by students of rape, assault, sexual harassment, and gender-based bullying," and "failed to take any meaningful action against perpetrators or to protect victims from future harassment."  FAC ¶¶ 2-3.  The FAC contains detailed examples of four recent incidents in which students have reported sexual assault and harassment to the District, notes that the District has taken no action to protect these students from their assailants and harassers, and, because of the District's inaction, alleges that the students have experienced severe emotional distress and have been deprived of educational opportunities.  *See id.* ¶¶ 14-68.  As the FAC makes clear, such incidents are indicative of a larger policy and practice of the District's "indifference to gender-based bullying, harassment, and assault," which "not only affects the victims, but it also impacts the student body and the school community as a whole," including by showing "students—particularly young women—that the very people charged with ensuring their safety in school will not protect them in their time of need."  *Id.* ¶¶ 4-5.  Indeed, the examples described in the FAC are not isolated incidents but rather illustrative of the District's policy and practice of indifference overall.  Even though "there have been over thirty documented incidents of sex discrimination, sexual harassment, sexual assault, or gender-based bullying at" the District, the District "has not created a single written safety plan or taken any documented effort to keep students safe following a rape, physical or sexual assault, or harassment."  *Id.* ¶ 5; *see also id.* ¶ 69.  Moreover, despite these incidents, the District has refused to take the most basic steps to prevent or respond to future sexual assaults.  *Id.* ¶¶ 70, 72.  Rather, the District has explicitly refused help in responding to and addressing instances of assault and

harassment. *Id.* ¶ 71. Such blatant apathy in response to several incidents of gender-based assault, bullying, and harassment clearly implicates "discrimination that has a destructive societal effect justifying *parens patriae* standing." *Peter & John's Pump House, Inc.*, 914 F. Supp. at 813; *see also Snapp*, 458 U.S. at 609 (holding that "state interest in securing residents from the harmful effects of discrimination" outweighs "narrow" view that only a set number of jobs were affected).

The District's arguments to the contrary ignore the above case law, disregard allegations that the OAG has made in the FAC, or otherwise fail to appreciate the nature of the OAG's interest in this matter. Principally, the District argues that the "OAG has stitched together" what, in its myopic view, are "four isolated and unrelated incidents." Def.'s Mem. at 7. But the incidents described in the FAC are far from isolated and unrelated. Instead, the incidents all concern gender-based bullying, harassment, and assault; all reveal the District's systemic failure to respond to such conduct; and all result in emotional distress and the loss of educational opportunities for the victims. *See* FAC ¶ 17-68.[5] Contrary to the District's protests otherwise, the "common thread between these claims," Def.'s Mem. at 9, is evident—the incidents show that the District has repeatedly and persistently ignored its obligations under Title IX and New York State law to protect students from gender-based bullying, harassment, and assault.

The District concedes, as it must, that the cases it cites "make clear that the substantial segment analysis is not purely an issue of numbers," but rather that such cases "concern an issue affecting, or at the risk of affecting a substantial and identifiable population." *Id.* at 9. Yet in its

---

[5] The District's baseless argument that the OAG initiated the instant action "as a response to the national media attention garnered by TG's case" should be rejected out of hand. *See* Def.'s Mem. at 8. The District's suggestion not only insultingly and tellingly minimizes the harms experienced by CC, AS, LW, and other victims of gender-based bullying, harassment, and assault reported in the District over the last several years but has no basis in fact. As explained above, the OAG brings this lawsuit to protect current and future students from the District's discrimination and negligence. To show the degree of the District's indifference, the OAG alleges that despite the significant negative national media attention regarding the District's inadequate response to TG's case, even then the District failed to address its systematic failures to protect its students from harassment, assault, and bullying on a going-forward basis. *See* FAC ¶ 70.

attempt to distinguish the relevant case law, the District fixates on and attempts to minimize the four examples the OAG has alleged of the District's discriminatory and negligent conduct. The very cases on which the District relies make clear, however, that "[t]he Attorney General's use of a small group of 'aggrieved persons' as exemplars for a larger class is neither new nor objectionable and does not render [the OAG] a nominal party." *Mid Hudson Med. Grp., P.C.*, 877 F. Supp. at 147.

Here, as explained above, the OAG plainly alleges that the District's indifference to gender-based bullying, harassment, and assault and its refusal to take steps to develop preventative polices or reform its practices has affected and has the capacity to affect all students—particularly young women—in the District. FAC ¶¶ 4-5, 69-72. To further support that other students have been affected by the District's indifference, the OAG alleges that even though the District has been notified of at least thirty incidents of sexual assault, harassment, or gender-based bullying in the last few years, it has not created a single written safety plan or documented any follow-up to ensure the safety of any of these students. FAC ¶¶ 5, 69.[6] Contrary to the District's protests otherwise, there can be no doubt that such population in the District is "relatively large"—indeed female students alone comprise 49% of the District's students.[7] *Cf. Utica*, 177 F. Supp. 3d at 748 (finding

---

[6] The District's complaint that the OAG "does not describe the nature of any of these other alleged incidents, much less the elements necessary to assert a legal claim" is wrong and, in any event, further contorts what the OAG is required to plead to meet its burden to allege harm to a substantial segment of the population. Def.'s Mem. at 9. The OAG clearly alleges that these additional incidents concern sexual assault, harassment, or gender-based bullying in the District—the very conduct that forms the basis for the OAG's lawsuit. Contrary to the District's understanding, the OAG does not plead these incidents as separate Title IX violations but rather as evidence that students in the District have been subjected to and reported to the District numerous incidents of sexual assault, harassment, and gender-based bullying over the years, and the District has failed to institute a single safety plan or written response or revise its policies or procedures in response, or to prevent such conduct in the future. Such allegations plainly support that a substantial segment of the District's population has been affected by its indifference and are at risk of being affected in the future.

[7] *See* New York State, Niagara-Wheatfield CSD Enrollment (2020-21), 2021 | NIAGARA-WHEATFIELD CSD - Enrollment Data | NYSED Data Site (last visited Apr. 2, 2022). "When considering a . . . Rule 12(c) motion, the Court may take judicial notice of certain matters of public record" including "notice of . . . governmental records." *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC.*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

the substantial segment of the population prong met where 25% of the city's residents were at risk of diversion to an inadequate educational program).  Moreover, the OAG here clearly alleges that the District's discrimination has and will continue to put at risk the well-being of current and future students, which courts have consistently found are concerns that justify the invocation of the OAG's standing under parens patriae.  *See, e.g.*, *Mid Hudson Med. Grp., P.C.*, 877 F. Supp. at 147 (focusing on the deaf population of the entire state, not on the number of deaf patients at the hospital that had or could be affected directly by the defendant's conduct and noting "New York's 'profound interest' in protecting possible future victims as well as the specified complainants from . . . sexual harassment gave it *parens patriae* standing" (*quoting New York v. Merlino*, No. 88-cv-3133 (S.D.N.Y. Aug. 18, 1990)); *Support Ministries For Persons with AIDS, Inc.*, 799 F. Supp. at 277 (finding the State had adequately pled a substantial segment of the population was affected when similar PWAs in months and years to come, as well as the members of the community itself were affected by "the harmful effects of discrimination" (internal quotation marks omitted)).  Accordingly, the OAG's allegations are squarely within the parameters of injuries that affect a substantial segment of the population.[8]

## Conclusion

The OAG has adequately pled its basis for standing and its claims.  The District's motion should accordingly be denied.

---

[8] The District is wrong that "this case is analogous to *People by Abrams v. Holiday Inns*, Inc. 656 F. Supp. 675, 677 (W.D.N.Y. 1984)." Def.'s Mem. at 10.  Contrary to the allegations in *Holiday Inns*, the OAG does not solely allege that other individuals "*may* be subjected to defendants' discriminatory practice."  *Holiday Inns*, 656 F. Supp. at 677. Instead, the OAG alleges that the District has legal and moral obligations to protect its students from sexual assault and gender-based harassment, has failed to do so numerous times, and, as such, has placed and will continue to place students at risk of deprivations of educational opportunity.  *See* FAC ¶¶ 14-72.  Unlike in *Holiday Inns*, there is no uncertainty that the District's conduct has affected and—if left unaddressed—will affect a large segment of its students.  In any event, courts have explicitly recognized that the holding in *Holiday Inns* "is more narrow than that of other courts considering the substantial segment requirement."  *Peter & John's Pump House, Inc.*, 914 F. Supp. 809; *see also Com. Of Mass. v. Bull HN Info. Systems, Inc.*, 16 F. Supp. 2d 90, 100 n. 7 (D. Mass. 1998) (noting that *Holiday Inns* "has been criticized" and declining to follow it).

LETITIA JAMES
Attorney General of the State of New York

By:  _/s/ Sandra Pullman_____
Sandra Pullman, Senior Counsel
Amanda Meyer, Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty St., 20th Floor
New York, NY 10005
(212) 416-8623
Sandra.Pullman@ag.ny.gov