UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PEOPLE OF THE STATE OF NEW YORK                          REPORT
  BY LETITIA JAMES, NEW YORK STATE                        and
  ATTORNEY GENERAL,                                   RECOMMENDATION

                              Plaintiff,            21-CV-00759JLS(F)

                  v.

NIAGARA-WHEATFIELD CENTRAL
  SCHOOL DISTRICT,

                              Defendant.
_____


APPEARANCES:              LETITIA A. JAMES
                          ATTORNEY GENERAL, STATE OF NEW YORK
                          Attorney for Plaintiff
                          AMANDA MARIE MEYER, and
                          SANDRA ELIZABETH PULLMAN
                          Assistant Attorneys General, of Counsel
                          28 Liberty Street
                          15th Street
                          New York, New York  10005

                          HARRIS BEACH PLLC
                          Attorneys for Defendant
                          DANIEL ROBERT LeCOURS, of Counsel
                          677 Broadway
                          Suite 1101
                          Albany, New York  12207
                                      and
                          SVETLANA K. IVY, of Counsel
                          99 Garnsey Road
                          Pittsford, New York  14534
                                      and
                          BRIAN CLINTON MAHONEY, and
                          TRACIE L. LOPARDI, of Counsel
                          Larkin at Exchange
                          726 Exchange Street
                          Suite 1000
                          Buffalo, New York  14210

,

## JURISDICTION

This case was referred to the undersigned by Honorable John L. Sinatra, Jr. on October 6, 2021, for all pretrial matters including preparation of a report and recommendation on dispositive motions.  The matter is presently before the court on Defendant's motion for judgment on the pleadings (Dkt. 34), filed March 10, 2022.

## BACKGROUND

On June 23, 2021, Plaintiff Letitia A. James, as Attorney General of the State of New York, commenced this action on behalf of the People of the State of New York as *parens patriae* ("Plaintiff") seeking declaratory and injunctive relief to remedy alleged violations by Defendant Niagara-Wheatfield Central School District ("Defendant") of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq*. ("Title IX"), and negligent supervision under New York common law.  By letter dated August 24, 2021, the Plaintiff and Defendant advised that Defendant consented to Plaintiff's request to file an amended complaint pursuant to Fed.R.Civ.P. 15(a)(2) (Dkt. 10).  Accordingly, on August 24, 201, Plaintiff filed an amended complaint (Dkt. 11) ("Amended Complaint").  On October 1, 2021, Defendant filed an answer (Dkt. 14).

On March 10, 2022, Defendant filed the instant motion for judgment on the pleadings (Dkt. 34) ("Defendant's Motion"), attaching the Declaration of Brian C. Mahoney[, Esq.] (Dkt. 34-1) ("Mahoney Declaration"), with exhibit A (Dkt. 34-2) ("Defendant's Exh. A"), and Defendant's Memorandum of Law in Support of Its Motion for Judgment on the Pleadings (Dkt. 34-3) ("Defendant's Memorandum").  On April 7, 2022, Plaintiff filed Plaintiff's Memorandum of Law in Opposition to Defendant's Motion

for Judgment on the Pleadings. (Dkt. 39) ("Plaintiff's Response").  On April 21, 2022,

Defendant filed Defendant's Reply Memorandum of Law in Further Support of Its Motion

for Judgment on the Pleadings (Dkt. 40) ("Defendant's Reply").  Oral argument was

deemed unnecessary.

Based on the following, Defendant's motion should be GRANTED and the Clerk

of Court directed to close the file.  Alternatively, Defendant's Motion should be DENIED.


## **FACTS**[1]

This action, brought by the People of the State of New York by Letitia James, as

New York State Attorney General as *parens patriae* ("Plaintiff"), is predicated on alleged

assault and sexual harassment experienced by four students ("the student victims")

while attending public schools within Defendant Niagara-Wheatfield Central School

District ("Defendant" or NWCSD or "the school district").  According to Plaintiff,

Defendant ignored the student victims' complaints of rape, assault, sexual harassment

and gender-based bullying, and failed to take any meaningful action against the

perpetrators of such conduct, which interfered with the students' right to a public

education guaranteed under federal law and caused the students to suffer mental,

emotional, and physical injury.  The four student victims, identified only by their initials,

include "T.G.," "C.C.," "A.S.," and "L.W."

## **T.G.**

Plaintiff alleges that in May 2018, T.G. was raped by a male student, "E.D.," while

in E.D.'s home.  T.G. reported the incident to the police and E.D. was arrested.  Prior to

---

[1] Taken from the pleadings filed in this action.

the start of the 2018-2019 school year, which was the senior year of high school for both T.G. and E.D., T.G. obtained a restraining order preventing E.D. from coming near her outside of school.  T.G.'s mother informed Michael Mann ("Principal Mann"), then the principal of the high school ("the high school"), attended by both T.G. and E.D., of the restraining order.  Although T.G. had no classes with E.D., T.G. maintains E.D. repeatedly went out of his way to encounter T.G., frequently standing outside T.G.'s classroom, waiting for T.G. to leave to room after which E.D. would glare at her.  T.G. notified the school counselor of these repeated interactions, but no corrective action was taken.  E.D. was permitted to continue playing sports but T.G., a cheerleader, was not permitted to cheer at certain games after she spoke with the Assistant District Attorney who was prosecuting the criminal rape case against E.D.  Through the social media application Snapchat as well as texts, T.G. received harassing messages and was bullied about the criminal case being pursued against E.D., and despite showing the messages to Principal Mann, no disciplinary action was taken against the students who sent the messages.  T.G. began skipping certain classes to avoid E.D.  On May 23, 2019, E.D. pleaded guilty to third-degree rape with sentencing scheduled for July 2019. T.G.'s mother informed the high school about E.D.'s guilty plea, but Principal Mann informed T.G.'s mother that despite the plea, E.D. would be permitted to attend both prom and graduation.  Later that month, T.G.'s mother posted to social media about Defendant's failure to protect T.G. from her rapist during the school year, with many parents noting their support in response to the post.  To express their anger with the high school's handling of the incident, students at the high school organized and attended a walkout ("the walkout") on May 31, 2019.  Principal Mann responded to the

4

walkout by blocking the high school's doorways to prevent participation by more students.  Several of the students who participated in the walkout received suspensions. After the walkout gained national attention, Defendant expelled E.D. at the conclusion of the school year.

## C.C.

Plaintiff describes C.C. as a "tomboy" who, commencing in seventh grade, while attending Defendant's middle school ("the middle school"), dressed in stereotypically male clothing, including hoodies.  Amended Complaint ¶¶ 42-43.  Throughout her years attending the middle School, C.C. was bullied and called "transgendered" and "gay" by fellow students.  *Id*.  Initially, C.C. went to the office of Dr. Peters, the middle school counselor, where C.C. cried about the harassment, with Dr. Peters allowing C.C. to do her school work in his office.  After a while, Dr. Peters stopped helping C.C. and told her to go back to her class.  Upon entering the high school in ninth grade, C.C. began to dress in more feminine clothing because of the harassment, but the bullying did not stop and the bullies instead made comments that C.C. was "fat" and "ugly," *id*. ¶ 45, with the bullies on one occasion calling C.C. a "slut" and telling C.C. to kill herself.  *Id*. ¶ 46. Because of the harassment, C.C. started missing school.  Despite C.C. and her family's repeated complaints about the bullying and harassment, Defendant took no action to create a safety plan or otherwise protect C.C. from the bullying.  C.C. attended counseling with a counselor and a psychiatrist to deal with the anxiety and depression caused by the harassment, but in December 2019, C.C. stopped attending the high school, and sought to transfer to a neighboring school in Niagara Falls, New York, but

Defendant refused to allow C.C. to transfer.  C.C. then dropped out of school and never graduated or received her high school diploma.

**A.S.**

As alleged in the Amended Complaint, while attending the high school, A.S. was bullied and harassed by members of the high school's football team and friends of the football players including, *inter alia*, creating and distributing a TikTok video mocking A.S.  At a high school pep rally for the football team, the high school's sophomore class performed a chant mocking A.S. and five sophomore girls displayed a poster about A.S. stating, "We don't want you."  Amended Complaint ¶ 54.  At the pep rally's conclusion, the five girls physically assaulted A.S., delivering eleven blows to her head. Immediately following the assault, A.S.'s mother informed Jeff White ("Mr. White"), who was then the high school's acting principal, about what transpired at the pep rally with regard to A.S.  Mr. White observed there was a winter dance scheduled to be held at the high school the next day, and that "it would be in A.S.'s best interest" if she did not attend, but allowed the students who physically assaulted A.S. at the pep rally to attend. *Id*. ¶ 56.  Several days passed and, despite A.S.'s mother repeatedly contacting the high school and NWCSD's superintendent, no action was taken against the five girls who assaulted A.S.  Because A.S. was too afraid of returning to the high school, her family enrolled her in a private school, requiring them to pay the private school's tuition.

**L.W.**

In 2017, L.W., then attending second grade at Errick Road Elementary School ("the elementary school"), was sexually assaulted in the housing complex by a neighbor ("the assailant") who was then attending fifth grade at the same elementary school.

6

L.W.'s mother reported the assault to law enforcement authorities after which a court[2] placed the assailant on probation, ordered the assailant's family to move from L.W.'s housing complex, and required L.W. receive therapy.  L.W.'s mother informed the elementary school's principal, Nora O'Bryan ("Principal O'Bryan"), and NWCSD superintendent Daniel Ljiljanich ("Superintendent Ljiljanich") about the assault and court proceedings, requesting the elementary school keep L.W. apart and safe from the assailant.  Superintendent Ljiljanich responded that because the assailant was entitled to an education, NWCSD would not take any action, advising that L.W. and her mother should move to protect L.W. from the assailant.  The assailant continued to harass L.W. at the elementary school where they had lunch at the same time every day, touching L.W.'s arm when she walked by and telling L.W. that she was "damaged goods" and that "no one will ever love you."  Amended Complaint ¶ 64.  On one occasion, the assailant followed L.W. into a bathroom at the elementary school and a teacher saw L.W. run out of the bathroom.  L.W.'s mother again attempted to contact Superintendent Ljiljanich who did not return her calls, and also raised her concerns to Principal O'Bryan who took no action to protect L.W.  The assailant eventually moved out of the school district,[3] after which other students bullied L.W. based on false statements the assailant made about L.W.  As a result of the assault and continuing sexual harassment, L.W. developed physical manifestations of stress and attended counseling for more than two years.

---

[2] The court is not further identified.
[3] The record does not specify when the assailant moved out of the school district.

Over the past few years, Defendant has been notified of more than thirty additional incidents of sexual assault, harassment, or gender-based bullying, yet has not created any written safety plan or documented any steps taken to ensure the safety of any of the students.  NWCSD never responded to an offer from the Rape Crisis Program at the YWCA for the Niagara Frontier to provide educational programming on domestic and dating violence and confidential advocacy for rape and sexual assault victims.  Plaintiff maintains the Rape Crisis Program is presented at every other school district in Niagara County except NWCSD.

## **DISCUSSION**

## 1.    **Judgment on the Pleadings**

Defendant moves pursuant to Fed.R.Civ.P. 12(c) ("Rule 12__"), for judgment on the pleadings.  "'The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim.'"  *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)).  "'To survive a Rule 12(c) motion, [the plaintiff's] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Id*. (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (bracketed material in original)[4]).  "'The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief ... calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal conduct.'"  *Id*. (quoting *Lynch*, 952 F.3d at 75 (internal quotation marks omitted)). In making this assessment, all reasonable

---

[4] Unless otherwise indicated, bracketed material has been added.

inferences must be drawn in the plaintiff's favor.  *Id.* (citing *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)).  Like a motion under Rule 12(b)(6), a motion under Rule 12(c) may be filed before discovery is complete.  *See* Fed. R. Civ. P. 12(c) (permitting motion "[a]fter the pleadings are closed—but early enough not to delay trial").  Nevertheless, "[u]ntil both parties have an opportunity to test their evidence at summary judgment or trial, we must accept the non-movant's pleading as true and decline to weigh competing allegations asserted by the moving party."  *Lively*, 6 F.4th at 301.

"'[J]udgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery, even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial.'"  *Lively*, 6 F.4th at 301 (quoting *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp.*, 933 F.3d 751, 761 (D.C. Cir. 2019) (internal quotation marks omitted)); *see also Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) (explaining that dismissal under Rule 12(c) is appropriate for self-defeating complaints—*i.e.*, complaints "whose allegations show that there is an airtight defense").  Accordingly, "where a 'question [of fact] is in dispute, it [is] improper for the district court to answer it on a motion for dismissal on the pleadings.'"  *Id.*, at 302 (quoting *Sheppard v. Beerman,* 18 F.3d 147, 151 (2d Cir. 1994); and citing 5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1367 (3d ed. 2021) ("[J]udgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court.")).  A court thus "may consider undisputed allegations of fact on a Rule 12(c) motion under the same standard as Rule 12(b)(6), but it may not use a motion for judgment on the pleadings to weigh disputed factual allegations."  *Id.*

In considering a Rule 12(b)(6) motion, the Supreme Court requires application of "a 'plausibility standard,' which is guided by '[t]wo working principles.'" *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id.* at 72 (quoting *Iqbal*, 556 U.S. at 678). "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss,' and '[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). To survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim will have 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Ashcroft*, 556 U.S. at 678); *see Twombly*, 550 U.S. at 570 (the complaint must plead "enough facts to state a claim to relief that is plausible on its face"). The factual allegations of the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 570.

"In ruling on a 12(b)(6) motion, and thus on a 12(c) motion, a court may consider the complaint as well as 'any written instrument attached to [the complaint] as an exhibit

or any statements or documents incorporated in it by reference.'" *Kalyanaram v.*

*American Ass'n of University Professors at New York Institute of Technology, Inc.*, 742

F.3d 42, 44 n. 1 (2d Cir. 2014) (quoting *Yak v. Bank Brussels Lambert*, 252 F.3d 127,

130 (2d Cir. 2001)) (bracketed material in original).  On a motion for judgment on the

pleadings, "'a court may consider ... matters of which judicial notice may be taken, [and]

documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied

on in bringing suit.'"  *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d

Cir. 2002) (internal quotation marks omitted; bracketed material and ellipses in

original)).

**2.    Title IX**

"Title IX of the Education Amendments of 1972 ("Title IX") was enacted to 'avoid

the use of federal resources to support discriminatory practices' and 'to provide

individual citizens effective protection against those practices.'"  *New York v. United*

*States Dep't of Educ.*, 477 F. Supp. 3d 279, 288 (S.D.N.Y. 2020) (quoting *Cannon v.*

*Univ. of Chicago*, 441 U.S. 677, 704 (1979)).  With certain exceptions not relevant here,

Title IX provides

> [n]o person in the United States shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or be subjected to discrimination under
> any education program or activity receiving Federal financial assistance.

> 20 U.S.C. § 1681(a).

Title IX defines "program or activity" in relevant part as "all of the operations" of a school

or covered entity, "any part of which is extended Federal financial assistance."  20

U.S.C. § 1687.  Sexual harassment, including student-on-student sexual harassment, is

a "form of discrimination prohibited by Title IX" for which a school district receiving

federal funding can be liable under Title IX.  *A.S. v. City School District of Albany*, __

F.Supp.3d __; 2022 WL 356697, at ** 18-19 (N.D.N.Y. Feb. 7, 2022) (quoting *Posso v.*

*Niagara Univ.*, 518 F.Supp.3d 688, 696 (W.D.N.Y. 2021) (citing *Davis v. Monroe County*

*Bd. of Ed.*, 526 U.S. 629, 649-50 (1999))).

Title IX's dual purposes may be enforced through federal administrative agencies

that disburse funding and "Congress expressly authorized an administrative

enforcement scheme for Title IX.  The DOE is authorized to promulgate rules,

regulations, and orders, and may use 'any ... means authorized by law,' including the

termination of funding, to effectuate the statute's restrictions."  *New York v. United*

*States Dep't of Educ.*, 477 F. Supp. 3d 279, 288 (S.D.N.Y. 2020) (quoting *Davis*, 526

U.S. at 638-39 (citation omitted).  Further, although Title IX "does not expressly speak to

a remedy in private litigation, the Supreme Court has held that Title IX may also be

enforced by a judicially implied private right of action . . . ."  *Id*. (citing Cannon, 441 U.S.

at 709).  In such "cases alleging intentional discrimination, money damages are

available as a remedy . . . ."  *Id*. (citing *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60,

76 (1992).

Preliminarily, the court considers Defendant's argument that Plaintiff lacks

standing to bring the Title IX claim as *parens patriae*.

## A.    Standing

Generally, "the doctrine of standing 'requires federal courts to satisfy themselves

that the plaintiff has alleged such a personal stake in the outcome of the controversy as

to warrant [the] invocation of federal-court jurisdiction.'"  *New York by Schneiderman v.*

*Utica City School Dist.*, 177 F.Supp.3d 739, 745 (N.D.N.Y. 2916) ("*Utica CSD*")

12

(bracketed material in original) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). The plaintiff must support each element of standing "'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010)). The Constitution's standing requirement, U.S.Const. Art. III, § 2, cl. 1, is a limitation on federal judicial authority to adjudicate only actual "cases" and "controversies," and requires a plaintiff "show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision*." Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 560-61 (1992)). In the absence of any explicit statutory authority to bring an action, the New York State Attorney General has standing to pursue a claim on behalf on New York's citizens only if the requirements for *parens patriae* standing are established. *See Connecticut v. Physicians Health Services of Connecticut, Inc.*, 287 F.3d 110, 121 (2d Cir. 2002) ("'states have frequently been allowed to sue in *parens patriae* to . . . enforce federal statutes that . . . do not specifically provide standing for state attorney generals.'" (quoting *New York ex rel Vacco v. Mid Hudson Med. Group, P.C.*, 877 F.Supp.143, 146 (S.D.N.Y. 1995) ("*Mid Hudson Med. Grp.*")).

   In the instant case, New York State Attorney General Letitia James brings this action pursuant to *parens patriae* authority defined as "the common-law principle that a sovereign, as parent of the country, may step in on behalf of its citizens to prevent injury

to those who cannot protect themselves." *Utica CSD*, 177 F.Supp.3d 739, 745 (N.D.N.Y. 2916). "[A] state may invoke the doctrine of *parens patriae* if it (1) articulates a 'quasi-sovereign interest' apart from the interests of particular private parties; (2) alleges a concrete injury to a substantial segment of its population; and (3) demonstrates that complete relief from that injury could not be obtained by individuals in a private lawsuit." *Id*. at 748 (*citing People v. Peter & John's Pump House, Inc*., 914 F.Supp. 809, 811-12 (N.D.N.Y. 1996) ("*Peter & John's Pump House*"). Defendant does not challenge Plaintiff's ability to meet the first and third requirements for *parens patriae* standing, but only the second, *i.e.*, a concrete injury to a substantial segment of its population.[5]

In particular, Defendant does not deny that the victims of the alleged sexual harassment sustained concrete injuries as a result of the harassment, but argues Plaintiff cannot establish such injury to a substantial segment of the population because Plaintiff does not allege a pattern of Title IX violations but, rather, "a scattering of alleged factually-disparate student-on-student incidents, over a 3-year period, many of which occurred off school grounds and/or when school was not in session." Defendant's Memorandum at 6-9. Defendant further argues that Plaintiff "has cherry-picked four unrelated and isolated cases of alleged student-on-student harassment in an attempt to establish *parens patriae* standing," Defendant's Memorandum at 9, and Plaintiff's "allegations of speculative future harm to a larger segment of the student

---

[5]  The court takes judicial notice that on March 2, 2022, T.G. filed a separate action in this court, 22-CV-00172-JLS-MJR, asserting essentially the same Title IX and negligent supervision claims, against NWCSD, seeking compensatory damages.  *See Bristol v. Nassau County*, 685 Fed.Appx. 26, 28 (2d Cir. 2017) (taking judicial notice of decisions in related state criminal proceedings as "self-authenticating, publicly available records" satisfying Fed.R.Evid. 201(b)(2) (specifying facts of which judicial notice may be taken).

population do not rise to the level of an alleged injury to a sufficiently substantial segment of the population." *Id*. at 10. In opposition, Plaintiff argues it has met its burden to plead a substantial segment of the population is affected by Defendant's discrimination and negligence based on gender because the four examples provided in the Amended Complaint are not isolated events, but are illustrative of Defendant's overall policy and practice of indifference for which Defendant has failed to take any steps to prevent or respond to future sexual assaults. Plaintiff's Response at 18-24. In further support of judgment on the pleadings, Defendant argues each of the cases on which Plaintiff relies involved a policy or practice of discriminatory conduct specifically targeting a discrete segment of the population whereas, in the instant case, Plaintiff has alleged injury to only the four individual student victims which is insufficient to confer *parens patriae* standing. Defendant's Reply at 2-3.

In analyzing the second factor, *i.e.*, requiring a concrete injury to a substantial segment of its population, "[t]here is no numerical talisman to establish *parens patriae* standing. . . ." *Peter & John's Pump House*, 914 F.Supp. at 812. "Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) ("*Snapp*"). "One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id*. *See also People by Abrams v. 11 Cornwell Co*., 695 F.2d 34,

39-40 (2d Cir. 1982) ("*11 Cornwell Co.*") (stating the plaintiff State of New York "ha[d] alleged injury to a sufficiently substantial segment of the population" to establish *parens patriae* standing because "were this kind of incident to be tolerated and left without redress, countless others would be affected"), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983).  The State must allege injury "to more than an identifiable group of individual residents," as well as "a 'practice and policy' of discrimination,' which necessarily involves a larger group of patrons." *Peter & John's Pump House*, 914 F.Supp. at 813.  In alleging an injury to a substantial segment of the population, the State's "'use of a small group of 'aggrieved persons' as exemplars for a larger class is neither new nor objectionable . . . ." *Id.* (quoting *People by Vacco v. Mid Hudson Medical Grp.*, 877 F.Supp. 143, 147 (S.D.N.Y. 1995) (finding *parens patriae* standing where the state alleged that a hospital discriminated against its seven to ten hearing-impaired patients because the effect of the discrimination "threatens all hearing impaired citizens and perhaps disabled citizens throughout New York.").  Further, "[a]lthough more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Snapp,* 458 U.S. at 607.  In the instant case, Plaintiff fails to establish that the alleged sexual harassment and discrimination of the four student victims within the NWCSD sufficiently establishes injury to a substantial segment of New York's population.

In particular, the Amended Complaint contains allegations pertaining to only the four student victims who attended schools within the NWCSD between 2017 and 2020,

which Plaintiff maintains are illustrative examples of Defendant's widespread failure to address and prevent gender-based harassment and sexual assault of students in violation of Title IX, asserting there are at least 30 additional "'documented incidents of sex discrimination, sexual harassment, sexual assault, or gender-based bullying'" within the NWCSD, yet NWCSD has failed to create any written safety plan or made any effort, despite rape, physical assault, and harassment of students, to keep students safe and to prevent or respond to future assaults.  Plaintiff's Response at 20-22 (quoting Amended Complaint ¶5, and citing *id*. ¶¶ 69-70, 72).  Such conclusory and unsupported allegations of conduct in violation of Title IX fail to support a plausible Title IX claim. *See Harris*, 572 F.3d at 72 (providing a court is not required to accept as true allegations that are no more than "legal conclusions" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements").  Moreover, the cases Plaintiff references in support of its argument that the alleged Title IX violations significantly affect a substantial percentage of the population for *parens patriae* standing, including  *11 Cornwell Co.*, *Utica CSD*, *Peter & John's Pump House*, *Mid Hudson Med. Grp.*, and *Support Ministries for Persons with AIDS, Inc. v. Village of Waterford*, New York, 799 F.Supp. 272 (N.D.N.Y. 1992) ("*Support Ministries*"), are inapposite.

In *11 Cornwell Co.*, the Second Circuit held that a partnership of neighborhood property owners who acquired and then failed to sell to the State a residence which would house up to ten mentally challenged adults affected a sufficiently substantial segment of New York's population to confer *parens patriae* standing upon the State of New York. *11 Cornwell Co.,* 695 F.2d at 39–40.  According to the court, the defendant

partnership's discriminatory conduct affected not just the ten mentally challenged persons who would initially occupy the residence, but "similar people in years to come . . . ."  *Id.*

*Utica CSD* concerned a policy and practice pursuant to which district officials routinely forced all immigrant students aged 17-20 who sought to enroll at the school district's only public high school into an alternative program intended to accommodate students who were considered to be "limited English proficiency" ("LEP"), without first determining whether such students' English-speaking ability was in fact limited.  *Utica CSD*, 177 F.Supp.3d, 744.  The numerosity requirement was found sufficient because the 25% of the city's population that spoke a language other than English at home was considered to be a "relatively large and still growing population of LEP children of immigrant families that reside within the District," and thus affected by the defendant's policy.  *Id.* at 748.

In *Peter & John's Pump House*, the State sued a night club alleging the club employed discriminatory policies and practices aimed at preventing admission to African Americans by requiring presentation of proof of age and imposing a dress code on African Americans but not on white patrons.  *Peter & John's Pump House*, 914 F.Supp. at 811.  Although the complaint provided eight examples of the defendant's alleged discriminatory conduct involving 16 individuals over an eight-month period, the court found the substantial segment requirement for *parens patriae* standing was met because the allegations involved "generalized discrimination against potential nightclub patrons," the alleged discrimination affected a large population, and there was "no

accurate method to determine how many African Americans may have been denied access to the Club because of their race." *Id*. at 813.

At issue in *Mid Hudson Med. Grp.* was whether the defendant hospital 's failure to provide interpretive services for its hearing impaired patients affected a substantial segment of New York's population. *Mid Hudson Med. Grp.*, 877 F.Supp. at 147. Because the plaintiff supplied data indicating the deaf population of New York may be as high as 7 %, the court extrapolated that the defendant's alleged discriminatory conduct affected a substantial segment of the State. *Id*. at 148.

Finally, in *Support Ministries*, New York challenged as arbitrary and unlawful discrimination a local village ordinance denying zoning approval for a residence for homeless persons afflicted with AIDS. *Support Ministries*, 799 F.Supp. at 275, 278. In finding the State alleged the Defendant's conduct posed a significant risk of harm to a substantial segment of the population, the court considered that although the proposed residence intended to provide housing for only 15 homeless persons with AIDS at one time, it was anticipated that other homeless persons with AIDS would be housed there in the future because the population of homeless people with AIDS was "not insubstantial and is ever increasing." *Id*. at 277. On this basis, the court found the alleged discriminatory conduct affected a substantial segment of the population for purposes of *parens patriae* standing. *Id*. at 278.

It is significant that there is a common thread in the cases on which Plaintiff relies, to wit, that in each referenced case, the alleged discriminatory conduct, policy, or practice would have routinely been enforced against a member of the targeted population. For example, in *Peter & John's Pump House*, the State alleged that any

African American who attempted to gain entry into the defendant nightclub would have been required to present proof of age and comply with a dress code, a policy which was not enforced with regard to white patrons.  In contrast, in *People of the State of New York v. Holiday Inns, Inc.*, 656 F.Supp. 675 (W.D.N.Y. 1984) ("*Holiday Inns*"), the State, suing as *parens patriae*, alleged claims against the defendant for age and gender discrimination in violation of federal and state employment laws based on the defendant's practices in hiring and discharging employees.  *Holiday Inns*, 656 F.Supp. at 677.  The court found the State's "assertions that countless other employees *may* be subjected to defendants' discriminatory practice of discharging older employees and that younger employees and customers of defendants would be deprived of the opportunity to work with or be served by employees of all ages" failed to allege an injury to a substantial segment of New York's population.  *Id.* (italics in original).  In other words, the asserted injury attributed to the defendant's alleged discriminatory practice against other employees was speculative.

In the instant case, there Amended Complaint does not plausibly allege that Defendant maintains a policy or practice that Defendant necessarily would fail to take any corrective action in response to any student attending a school within the NWCSD who complains about gender-based harassment and sexual assault, or that having a written safety plan would necessarily prevent such conduct by other students within NWCSD.  *See Snapp,* 458 U.S. at 607 ("more must be alleged than injury to an identifiable group of individual residents").  Nor is Plaintiff's conclusory assertion that more than 30 additional incidents of sexual assault and gender-based harassment sufficient to establish concrete injury.  *Utica CSD*, 177 F.Supp.3d at 748 (*parens patriae*

standing requires "a concrete injury to a substantial segment of its population"). Accordingly, Defendant's Motion should be GRANTED as to Plaintiff's Title IX claim for failure to establish the substantial segment requirement for *parens patriae* standing.

Alternatively, should the District Judge disagree with the determination that Plaintiff has failed to allege Defendant's violation of Title IX resulted in injury to a substantial segment of the population, judgment on the pleadings should nevertheless be granted because Plaintiff cannot allege the requisite injury to establish a valid case or controversy. In particular, Plaintiff seeks only declaratory and injunctive relief. Amended Complaint, Prayer for Relief. "It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (citing cases). Significantly, the plaintiff must have a "personal stake in the outcome." *Id*.

In the instant case, Plaintiff's allegations of past injury alone do not suffice to establish an injury in fact for a plaintiff seeking declaratory or injunctive relief. *See Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992); *Golden v. Zwickler*, 394 U.S. 103, 109-10 (1969). Abstract injury is not enough; rather, the plaintiff must show that it "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged official conduct and the injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical." *Lyons,* 461 U.S. at 101-02. *See Farmland Dairies v. McGuire*, 789 F. Supp. 1243, 1250 (S.D.N.Y. 1992) (a plaintiff must allege a "real and immediate threat that the injury will be continued or repeated"). "To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other

things, that they suffered a concrete harm.  No concrete harm, no standing."

*TransUnion LLC v. Ramirez*,  __ U.S. __, 141 S. Ct. 2190, 2200 (2021) (citing *Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 340 (2016)).  "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms including . . . reputational harm."  *Id.* (quoting *Robins*, 578 U.S. at 341.

In the instant case, Plaintiff cannot pursue injunctive relief requiring policy changes by NWCSD under Title IX with regard to any student who has graduated or otherwise left the school district because no such victim could benefit from the relief sought.  *A.S. v. City Sch. Dist. of Albany*, 2022 WL 356697, at *26 (N.D.N.Y. Feb. 7, 2022) (citing *Cook v. Colgate University*, 992 F.2d 17, 19 (2d Cir. 1993), and *B.C. v. Mount Vernon Sch., Dist.*, 660 Fed.Appx. 93, 96 (2d Cir. 2016)).  Because T.G. has graduated from high school, C.C. dropped out of school, and A.S. transferred to a private school, Plaintiff cannot benefit from any changes to Defendant's policies as to those victims.  Further, with regard to L.W. who was in second grade in 2017 and, thus, unlikely to have graduated from high school, not only does the Amended Complaint fail to allege whether L.W. remains a student within NWCSD, but the Amended Complaint also fails to allege L.W. continues to experience any sexual assault or gender-based bullying or harassment. Thus, insofar as the Amended Complaint seeks injunctive relief changing NWCSD's policies or practices, Plaintiff lacks standing to pursue such relief.

Defendant's Motion thus should be granted for lack of standing.

### B.    Elements of Title IX Claim

Should the District Judge disagree that Plaintiff's Title IX claim should be
dismissed for lack of standing based on a failure to establish the *parens patriae*
doctrine's injury to a substantial segment of the population requirement, or because the
declaratory and injunctive relief sought is not available in the circumstances in which
this action is brought, the court alternatively considers whether Defendant should be
granted judgment on the pleadings based on the elements of the Title IX claim.[6]
Plaintiff contends that the District violated Title IX by acting with deliberate indifference
to sexual harassment toward T.G., C.C., A.S. and L.W., which resulted in excluding the
four student victims from meaningful participation at schools within NWCSD.  As stated,
relevant to the instant case, Title IX provides "[n]o person in the United States shall, on
the basis of sex, be excluded from participation in, be denied the benefits of, or be
subjected to discrimination under any education program or activity receiving Federal
financial assistance."  20 U.S.C. § 1681(a).  The elements for a Title IX student-on-
student sexual harassment claim include "that '(1) a federally funded educational
institution (2) was deliberately indifferent to and (3) had actual knowledge of (4) sexual
harassment that was so severe, pervasive, and objectively offensive that it could be
said to have deprived the plaintiff of access to the educational opportunities or

---

[6] Although in *Cannon*, the Court recognized Title IX may be enforced by a judicially implied private right of
action, *Cannon*, 441 U.S. at 709, whether such private right of action includes an action brought by a
state as *parens patriae* as in the instant case was not addressed.  Further, *Cannon* recognized the
implied right of action only for monetary damages for intended beneficiaries of federal financial support for
education, *id.*, in contrast to the instant action where Plaintiff seeks only declaratory and injunctive relief.
*See Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011) (recognizing the Supreme Court "strictly
curtail[s] the authority of the courts to recognize implied rights of action . . . ." (citing *Alexander v.
Sandoval*, 532 U.S. 275, 286-87 (2001)).  In the instant case, the Amended Complaint fails to allege the
Attorney General, acting in *parens patriae*, is a beneficiary of federal financial support within the scope of
Title IX.  *Cannon*, 441 at 709.

benefits.'" *A.S. v. City Sch. Dist. of Albany*, 2022 WL 356697, at *19 (N.D.N.Y. Feb. 7, 2022) (quoting *Roskin-Frazee v. Columbia Univ.*, 2018 WL 6523721, at *4 (S.D.N.Y. Nov. 26, 2018) (citing *Davis*, 526 U.S. at 650)); *Posso*, 518 F.Supp. 3d at 696 (same). *See also AA by BB v. Hammondsport Cent. Sch. Dist.*, 527 F. Supp.3d 501, 510–11 (W.D.N.Y. 2021) (describing the elements for student-on-student harassment claims under Title IX as including "(1) school authorities had actual knowledge of the harassment or the risk thereof; (2) they were deliberately indifferent to it; and (3) the harassment was so 'severe, pervasive, and objectively offensive' that it deprived the student of access to the educational opportunities and benefits provided by the school." (quoting *Carabello v. New York City Dept. of Educ.*, 928 F. Supp.2d 627, 638 (E.D.N.Y. 2013)).

Acknowledging "the inevitability of student misconduct" and the "practical realities of responding to student behavior," the Supreme Court has explained that this standard will not be met by "simple acts of teasing and name-calling," nor will it be met by a "single instance of one-on-one peer harassment" unless the instance is "serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Davis*, 526 U.S. at 652-53. As such, when analyzing whether the conduct alleged meets the "severe, pervasive, and objectively offensive" requirement, the "constellation of surrounding circumstances, expectations, and relationships" must be considered to determine whether the conduct alleged was sufficiently severe, sufficiently frequent or pervasive, or both, to have denied the victim equal access to educational opportunities. *Davis*, 526 U.S. at 630 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). Additionally, a school has actual

knowledge of harassment when a school official with "authority to address the alleged discrimination and to institute corrective measures" has actual knowledge of the discrimination. *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011). Further, a school is deliberately indifferent to sexual harassment when its response is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648–49. In the instant case, the parties do not dispute that NWCSD is a federally funded educational institution as required for the first element of a Title IX claim. Accordingly, the court addresses only the remaining three elements as to each of the student victims.

With regard to T.G., the rape by E.D. occurred outside of NWCSD property. Nevertheless, at the start of the school year following the rape, T.G. obtained a restraining order preventing E.D. from coming near her outside of school, and T.G.'s mother informed the then high school principal Mann of the restraining order. Despite being aware of the restraining order, E.D. repeatedly went out of his way in school to encounter T.G. who notified the school counselor of these repeated interactions, but no corrective action was taken. T.G. was also repeatedly subjected to harassment through social media, yet even after showing the messages to Principal Mann, no disciplinary action was taken against E.D. or the students who sent the messages. T.G. eventually began skipping certain classes to avoid E.D. Even after T.G.'s mother informed the high school about E.D.'s guilty plea in May 2019 to third-degree rape Principal Mann informed T.G.'s mother that despite the plea, E.D. would be permitted to attend both prom and graduation. It was not until May 31, 2019, when high school students, to express their anger with the high school's handling of the incident, organized a walkout

that garnered national media attention, that Defendant expelled E.D. at the conclusion

of the school year.  Defendant's alleged failure to protect T.G. from continued

harassment from her attacker, E.D., and other students who sided with E.D., after being

made aware of the rape for which E.D. was being criminally prosecuted, that T.G. had

obtained a restraining order preventing E.D. from coming near T.G., and the

subsequent harassment T.G. endured by other students both in person and over social

media, such that T.G. began skipping classes, as well as the decision that T.G., after

speaking with the prosecutor handling the criminal action against E.D., should not be

permitted to cheer at certain games, can be construed as establishing Defendant was

deliberately indifferent to the harassment T.G. endured throughout her senior year.  *See*

*AA by BB*, 527 F.Supp.3d at 510-13 (denying defendant school district's motion to

dismiss Title IX claim for student-on-student harassment where the defendant school

district "received notice of the [initial] harassing conduct, it had a duty under Title IX to

take some action to prevent the further harassment" such that the defendant's failure to

do so was "clearly unreasonable" in light of the assailant's openly mocking and ridiculing

the victim in front of other students and recruiting other students to do likewise).  *See*

*also Doe ex rel, A.N. v. East Haven Bd. of Education*, 430 F.Supp.2d 54, 60 (D.Conn.

2006) (plaintiff student prevailed on Title IX claim where victim student was raped by

two other students off school property, after which the victim was sexually harassed by

classmates at school for three months).  Accordingly, Plaintiff meets the criteria for

plausibly pleading a Title IX claim with regard to T.G.

Turning to C.C. who, in middle school, dressed in stereotypically male clothing,

for which she was bullied and called "transgender" and "gay," and upon entering high

school began to wear more feminine clothing following which she was bullied and called "fat," "ugly," and a "slut" and urged to kill herself, both Dr. Peters, the middle school counselor, as well the superintendent were aware of the bullying, yet took no steps to stop the harassment and ever refused to allow C.C. to transfer to a different school to escape the bullying.  C.C. attended counseling to deal with the stress caused by the harassment but, in December 2019, after C.C. failed to obtain any relief from the bullying and was not allowed to attend a different school, C.C. dropped out of school and never graduated high school.  Courts within the Second Circuit have found the continuous bullying related to a student's sexuality can be sufficiently "severe, pervasive, and objectively offensive," *Davis*, 526 U.S. at 653, to support a Title IX claim. *See*, *e.g.*, *Estate of D.B. v. Thousand Islands Central School District*, 169 F.Supp.3d 320, 332-33 (N.D.N.Y. 2016) (recognizing Tilte IX claim for harassment based on sexual orientation); *Doe ex rel, A.N.*, 430 F.Supp.2d at 60 (affirming jury verdict against defendant school district on Title IX claim where victim student was sexually harassed by classmates for three months after being sexually assaulted by two other students). The allegations with regard to C.C. thus are sufficient to plausibly establish a Title IX claim.

The allegations regarding A.S. include that while attending the high school, A.S. was bullied and harassed by members of the high school's football team and friends of the football players including creating and distributing through social media a video mocking A.S, performing a chant at a high school pep rally mocking A.S, displaying a poster conveying that A.S. was not wanted and physically assaulting A.S., striking A.S. on the head eleven times.  Although A.S. immediately informed Mr. White, the then high

school acting principal about the assault, White's response was to advise A.S. not to attend an upcoming school dance which A.S.'s attackers were allowed to attend. A.S.'s mother made additional calls to the high school, as well as to the NWCSD's superintendent, but no disciplinary action was ever taken with regard to the assailants. Because A.S. was too afraid to return to the high school, her family enrolled A.S. in a private school for which they had to pay tuition. Again, Defendant is alleged to have had actual knowledge of the harassment toward A.S., yet refused to take any action to stop the harassing conduct, such that A.S. did not feel safe returning to the high school. Although it is not clear whether Defendant had knowledge of the harassment A.S. encountered prior to the assault, Defendant's subsequent knowledge that A.S. endured an attack by five classmates during which A.S. was struck in the head eleven times is sufficiently severe "to overcome the lack of pervasiveness for purposes of Title IX liability . . ." and placed Defendant on notice that A.S.'s assailants posed a substantial risk of harm to A.S., such that the school environment for A.S. was sufficiently hostile that Defendant's failure to take any corrective action deprived A.S. of educational opportunities. *See AA by BB*, 527 F.Supp.3d at 512 (after receiving notice of the initial harassing conduct, the defendant school district had a duty under Title IX to take action to prevent further harassment in a manner not clearly unreasonable). The claim is therefore plausibly alleged as to A.S.

The allegations are also sufficient to establish a Title IX claim with regard to L.W. who, in 2017, was in second grade when she was sexually assaulted by a neighbor then attending fifth grade at the same elementary school. Although L.W.'s mother informed Principal O'Bryan, then the elementary school's principal, and NWCSD

Superintendent Ljiljanich about the assault and the court proceedings, including that the assailant was on probation, the assailant's family was ordered to move from L.W.'s housing complex, and that L.W. receive therapy, Superintendent Ljiljanich responded that NWCSD would take no action to protect L.W. from the assailant who was entitled to an education, suggesting to L.W.'s mother that she should move to a different school to protect L.W. The assailant then continued to both physically and verbally harass L.W. at the elementary school where they had lunch at the same time every day, even following L.W. into the bathroom. L.W.'s mother's further attempts to contact Superintendent Ljiljanich and Principal O'Bryan were futile. After the assailant eventually moved out of the school district, other students at the elementary school bullied L.W. based on false statements the assailant made about L.W., and the assault and continuing sexual harassment caused L.W. to develop physical manifestations of stress for which L.W. attended counseling for more than two years. These allegations support sufficiently "severe, pervasive, and objectively offensive" conduct to place Defendant on notice that L.W. faced a substantial risk of harm from the environment at the elementary school for purposes of establishing a Title IX claim. *See AA by BB*, 527 F.Supp.3d at 510-13 (defendant school district's receipt of notice of student-on-student harassment imposes duty to take reasonable action to prevent further harassment); *Doe ex rel, A.N.*, 430 F.Supp.2d at 60 (off-campus rape of plaintiff student followed by on-campus sexual harassment for three months by classmates established Title IX claim). Accordingly, the allegations pertaining to L.W. plausibly establish a Title IX claim for student-on-student harassment.

Accordingly, the record does not support judgment for Defendant based on the pleadings.

**3.    Negligent Supervision**

**A.    Supplemental Jurisdiction over State Claim**

Should the District Judge agree with the recommendation that the Title IX claim be dismissed for lack of standing, the dismissal of all federal claims leaves the decision whether to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) over the remaining state claims a matter within the court's discretion. *See Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 304-05 (2d Cir. 2003) (reviewing for abuse of discretion federal district court's decision to decline exercising supplemental jurisdiction over state law claims after all federal law claims have been eliminated prior to trial). In discerning whether to exercise supplemental jurisdiction after dismissal of all federal claims, courts must balance judicial economy, convenience, fairness, and comity. *Id.* (citing *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 349-50 (1988)). In the instant case, insofar as Plaintiff asserts a state law claim for negligent supervision, the court should refrain from exercising supplemental jurisdiction over the state claim because the federal Title IX claim has been dismissed and the state claim raises, as in this case, complex questions as to the scope of the state claim. *See Shahriar v. Smith & Wollensky Restaurant Group, Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (citing 28 U.S.C. § 1367(c)). Alternatively, the court addresses whether the Amended Complaint sufficiently establishes a common law negligent supervision claim.[7]

---

[7] The court notes the same "plausibility" standard applies to its review of Plaintiff's state common law claim. *See Khan v. Yale University*, 27 F.4th 805, 817 (2d Cir. 2022) (reviewing dismissal of state law claim for plausibility pursuant to Rule 12(b)(6)).

**B.    Elements of Negligent Supervision Claim**

Preliminarily, as discussed, the court initially recommends dismissal of the Title

IX claim for lack of jurisdiction, *see* Discussion, *supra*, at 22, and with the dismissal of

the Title IX claim before the court on federal subject matter jurisdiction, given the early

stage of the instant action, the court should refrain from exercising supplemental

jurisdiction over Plaintiff's negligent supervision claim pursuant to New York common

law.  *See* Discussion, *supra*, at 30.  Alternatively, the court addresses whether

Defendant is entitled to judgment on the pleadings on the negligent supervision claim in

the interest of completeness should the District Judge disagree with the

recommendation that the matter be dismissed in its entirely for lack of jurisdiction on the

Title IX claim.

Under New York law, "[s]chools are under a duty to adequately supervise the

students in their charge and they will be held liable for foreseeable injuries proximately

related to the absence of adequate supervision."  *Carabello v. New York City Dep't of

Educ.*, 928 F. Supp. 2d 627, 646 (E.D.N.Y. 2013).  "The attendant duty of care has been

described as that of a 'reasonably prudent parent,' and as such, 'school personnel

cannot reasonably be expected to guard against all of the sudden, spontaneous acts

that take place among students daily ... absent proof of prior conduct that would have

put a reasonable person on notice to protect against the injury-causing act.'"  *AA by BB*,

527 F. Supp.3d at 507 (quoting *Mirand v. City of New York*, 637 N.E.2d 263, 266 (N.Y.

1994)).

In the instant case, Defendant argues Plaintiff's negligent supervision claim is deficient with regard to each of the four student victims because Plaintiff has failed to allege Defendant had sufficient specific knowledge or notice of the dangerous conduct to which each student was subjected.  Defendant's Memorandum at 17-18.  Defendant further maintains the injunctive relief Plaintiff seeks is not available on the negligent supervision claim.  *Id*. at 21-22.  In opposition, Plaintiff argues it has sufficiently alleged Defendant violated its duty to adequately supervise its students because Defendant had specific knowledge and notice of the alleged harmful behavior, Plaintiff's Response at 14-15, as well as that Defendant's negligence in failing to address the harmful behavior proximately caused the victims' injuries.  *Id*. at 15-16.  Plaintiff also maintains it may seek injunctive relief to redress its negligent supervision claim.  *Id*. at 16-18.  In further support of its motion, Defendant repeats the argument that Plaintiff failed to plead sufficient knowledge or notice of the dangerous conduct suffered by the four student victims to support a negligent supervision claim, Defendant's Reply at 8-9, and that while Plaintiff seeks injunctive relief, generally, only monetary damages are available on a negligent supervision claim.  *Id*. at 9-10.

Preliminarily, insofar as Plaintiff seeks injunctive relief on its negligent supervision claim, as discussed above in connection with standing to pursue the Title IX claim, Discussion, *supra*, at 20-22, insofar as the Amended Complaint seeks injunctive relief changing NWCSD's policies or practices, such relief is not available where the action complained of has ceased.  Accordingly, judgment on the pleadings should be granted in favor of Defendant on Plaintiff's negligent supervision claim.  Alternatively,

the pleadings establish the elements of a common law negligent supervision claim under New York law.

In particular, "[s]chools are under a duty to adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision." *Mirand*, 637 N.E.2d at 266 (citing *Lawes v. Board of Educ.,* 213 N.E.2d 667, 668-69 (N.Y. 1965); *Decker v. Dundee Cent. School Dist.,* 151 N.E.2d 866, 868 (N.Y. 1958)).  Nevertheless, schools "are not insurers of safety" and "cannot reasonably be expected to continuously supervise and control all movements and activities of students; therefore, schools are not to be held liable 'for every thoughtless or careless act by which one pupil may injure another.'"  *Id*. (quoting *Lawes,* 213 N.E.2d at 668-69*; Ohman v. Board of Educ.,* 90 N.E.2d 474, 475 (N.Y. 1949)).  The duty owed to students is derived from the fact that "a school, in assuming physical custody and control over its students, effectively takes the place of parents and guardians."  *Id*. (citing *Pratt v. Robinson,* 349 N.E.2d 849, 852 (N.Y. 1976)).  Further, "[i]in determining whether the duty to provide adequate supervision has been breached in the context of injuries caused by the acts of fellow students, it must be established that school authorities had sufficiently specific knowledge or notice of the dangerous conduct which caused injury; that is, that the third-party acts could reasonably have been anticipated," and actual or constructive notice prior to similar conduct is sufficient. *Id*., 637 N.E.2d at 267. "Even if a breach of the duty of supervision is established, the inquiry is not ended; the question arises whether such negligence was the proximate cause of the injuries sustained."  *Id*.

In the instant case, there are sufficient allegations establishing Defendant breached its duty to supervise the students with regard to each of the four student victims.  Specifically, as discussed, Facts, *supra*, at 3-7, in each of the pleaded scenarios, administrative personnel were aware of the alleged harassing and assaultive conduct of students attending schools within NWCSD, but took no action to ensure the safety of the student victims.  As a result, each of the student victims suffered injuries including missing classes (T.G., who did not feel safe attending certain classes); dropping out of school (C.C., who dropped out of school because she did not feel safe); transferring to a private school (A.S., who transferred to a private school after being physically assaulted and the high school administrators and NWCSD superintendent refused to take any disciplinary action against the assailants), and developing stress and anxiety requiring counseling for two years (L.W., who, after school officials refused to take any action to keep her assailant away from her, was forced to encounter her assailant every day at lunch who continued to harass her).  *See Eskenazi-McGibne v. Connetquot Central School District*, 89 N.Y.S.3d 298-99 (2d Dept. 2018) (affirming denial of defendant school district's motion to dismiss for failure to state a claim for, *inter alia*, negligent supervision where plaintiff student alleged mental and emotional injuries resulting from repeated bullying and harassment by a fellow student for which the plaintiff student's parents repeatedly complained to the school district, teachers, and administrative officials); *Wilson v. Vestal Central School District*, 825 N.Y.S.2d 159, 160-61 (3d Dept. 2006) (affirming trial court's denial of defendant school district's motion for summary judgment on negligent supervision claim where plaintiff was injured when classmate pulled a chair out from under her while seated in the school cafeteria,

because there were issues of fact regarding the defendant's knowledge of prior conflicts between the plaintiff and her classmate dating to middle school where the classmate exhibited aggressive an confrontational behavior toward the plaintiff).  Accordingly, should the District Judge reach the elements of Plaintiff's negligent supervision claim on Defendant's Motion, then Defendant should be DENIED judgment on the pleadings as to such claim.

## **CONCLUSION**

Based on the foregoing, Defendant's motion (Dkt. 34) should be GRANTED and the Clerk of Court directed to close the file.  Alternatively, Defendant's Motion should be DENIED.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     May 11th, 2022
               Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

<u>**Failure to file objections within the specified time or to request an**</u> <u>**extension of such time waives the right to appeal the District Court's Order.**</u> *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     May 11th, 2022
               Buffalo, New York

36